NEAL–COOPER GRAIN COMPANY, an Illinois Corporation, Plaintiff-Appellant, Cross-Defendant-Appellee,

v.

TEXAS GULF SULPHUR COMPANY, a Texas Corporation, Defendant-Appellee, Cross-Complainant-Appellant.

Nos. 73–1486, 73–1503 and 73–1558.

United States Court of Appeals, Seventh Circuit.

Argued April 10, 1974.

Decided Dec. 17, 1974.

284

Jack E. Horsley, Richard F. Record, Jr., Stephen L. Corn and Glenn A. Braden, Mattoon, Ill., for Neal-Cooper Grain Co.

F. Daniel Welsch, Danville, Ill., for Texas Gulf Sulphur Co.

Before FAIRCHILD, PELL, and STEVENS, Circuit Judges.

PELL, Circuit Judge.

This is an appeal and a cross-appeal from a judgment entered by the district court following a bench trial in a diversi-

ty case. Neal-Cooper Grain Company (Neal-Cooper) in its complaint sought damages for breach of an alleged contract. The defendant Texas Gulf Sulphur Company (TGS) counterclaimed for the price, plus interest, of certain fertilizer materials sold and delivered to Neal-Cooper but not arising out of the transaction involved in plaintiff's complaint. The liability for the principal amount owing on the counterclaim, $105,907.85, was stipulated on the date of the trial but "the question of the liability for and the amount of interest due on [the principal amount was] reserved."

## I. FACTS

Neal-Cooper is engaged in the business of selling grain and fertilizer. Its office and plant are located at Windsor, Illinois. TGS supplied phosphates and potash to Neal-Cooper for resale several years prior to 1969. During this period, the parties conducted business on an order basis without written contracts. Pursuant to orders placed by Neal-Cooper, TGS shipped fertilizer from mines under its control either to Neal-Cooper at Windsor or occasionally directly to other recipients designated by Neal-Cooper.

Sometime in mid-October 1969 Gary Cooper, vice-president of Neal-Cooper, called Charles Odum, TGS midwest sales manager, in Chicago to inquire about the availability of potash for sale by TGS. Price and quantity were discussed in general terms, and Odum indicated that he would send Cooper a written sales contract.

Approximately November 20, 1969, Cooper received two copies of the proposed contract by mail. A brief cover letter instructed Cooper as follows: "Please sign the enclosed contracts and return to the Chicago office. We will return a copy to you for your files." The two documents already bore the signatures of B. W. Guess. Guess was TGS's general sales manager for domestic sales of potash and phosphates, with an office in Raleigh, North Carolina.

Cooper signed both copies, made a photostatic copy of one of them, and returned both originals to Odum in Chica-go about November 25. The documents apparently were received in Chicago but were misplaced shortly thereafter, since a search of the Chicago office files in December failed to locate them. Two weeks prior to trial they were found in Odum's office in Oak Brook, Illinois. There was no evidence that the documents ever were sent from Chicago to New York for further approval.

The document signed by Guess and Cooper was a TGS printed form contract. By its terms, TGS agreed to sell and ship and Neal-Cooper agreed to buy and receive at its plant, for the period November 1, 1969, through June 30, 1970, the following quantities of potash: 10,000 tons of coarse and 2,000 tons of granular. The sale was to be "in accordance with the terms and conditions stipulated herein and with the seller's attached Price List dated . . . .," which is hereby made a part of this contract. . . ." No date was shown for the price list, and no price list as such was attached to the agreement. Rather, the following terms were typed near the bottom of the agreement's front side:

"2% 30, Net 180 Days

Coarse at 21¢ per unit through January 31, 1970

Granular at 23¢ per unit through January 31, 1970"

Immediately thereunder appeared the word "ACCEPTED:," followed by the signatures of Cooper and Guess. Guess's signature appeared to the right of Cooper's beneath the printed designation, "Potash Division, Texas Gulf Sulphur Company (Incorporated)" and over the printed title, "Manager of Sales." It was stipulated that both Guess and Cooper "had the authority to execute contracts for their respective companies."

The contract form stated it was "made in the City and State of New York, this Fifth day of November 1969," between TGS the seller and "Neal-Cooper Grain Company, Windsor, Illinois, the buyer." Shipment was to be "F.O.B. cars seller's plant Potash, Utah." The printed front portion of the document further provided that the "contract shall not be bind-

ing upon the seller until duly accepted at its New York Office." Among the printed terms and conditions appearing on the reverse side of the form was a provision which enabled TGS to institute a general price increase effective fifteen days after receipt by the buyer of a revised TGS price list. The agreement also contained a general exculpatory clause excusing the parties from any failures to perform caused by, *inter alia*, "the operation of statutes or of law."

Between November 12 and December 4, 1969, TGS shipped and billed to Neal-Cooper three shipments of potash. The total amount shipped during this period was 278.63 tons of coarse and 300.14 tons of granular. Two of the three shipments occurred prior to the time Cooper executed the purported sales contract. According to the invoices, the granular potash, priced at 23¢ per unit, was shipped directly to Neal-Cooper at Windsor, while the coarse, at a price of 21¢ per unit was sent to Cisne Seed Company and Cox Fertilizer Company in Cisne and Bradford, Illinois, respectively. All shipments were shipped freight prepaid; however, Neal-Cooper was billed for the amount of the freight charges.

On December 2, 1969, Cooper sent the following teletype order for potash to TGS in Chicago:

"As Per Contract Agreement We Wish To Place The Following Shipping Instructions.

"First 25 Working Days of Jan. Ship 1–100 Ton Hopper Each Day to Neal-Cooper Grain Co. at Bradford, Ill. Freight Prepaid. CB&Q Dely.

"First 25 Working Days of Jan. Ship 1–100 Hopper Each Day to Neal-Cooper Grain Co. At Flora, Ill. Freight Prepaid. B&O Dely.

"First 25 Working Days of Jan. Ship 2–100 Ton Hoppers Each Day to Neal-Cooper Grain Co. Windsor, Ill. Freight Prepaid. PC Dely.

"All Above Orders Are for Coarse Potassh [sic].

"If There Are Any Changes Or Amendments To Our Contract We Would Reserve The Right To Change These Shipping Instructions."

Cooper admitted at trial that a ten thousand ton order was "larger than normal," and that he had never previously ordered potash in such quantity for shipment within thirty days.

TGS made no response to the December 2 order. On January 17, 1970, Neal-Cooper received a price list from TGS which listed new prices for coarse (35¢) and granular potash (37¢) effective January 1, 1970. The price list stated, *inter alia*, that shipments were to be "at Seller's option from either Allan, Saskatchewan; Moab, Utah or Seller's warehouses."

On January 20, 1970, Cooper sent a second teletype message to the TGS Chicago office. The message began as follows:

"Due to the fact that there are only 21 working days in January we only need to complete our orders. We have been holding these orders waiting for your [sic] to start shipping."

The message went on to list seven separate orders totalling 1,020 tons of coarse and 1,570 tons of granular potash. All but one of the orders were for recipients other than Neal-Cooper at Windsor. At trial Cooper testified that these orders were only part of the orders which Neal-Cooper had at that time.

In late January or early February 1970, Cooper saw Guess and Odum at a plant foods convention in Chicago. Guess told Cooper that TGS would not ship potash to Neal-Cooper at the old prices listed in the sales contract.

On February 7, 1970, Cooper sent a photostatic copy of the contract to Dr. Guy McBride, Vice President of TGS. On February 20 Guess responded with a letter to Cooper, in which he stated that TGS had "never received the original signed copy of the contract." The letter, however, did not deny the existence of a contractual relationship but merely referred to the fact that the orders of December 2 "were not accepted or confirmed to you." The letter further stated that TGS "did not have the product to ship or the capability to ship this tonnage to just one customer if we had the product available." The letter concluded

by referring to certain Canadian government regulations which allegedly controlled production and price of potash from the TGS mine at Allan, Saskatchewan, and that "we cannot promise any fixed tonnage for shipment in the future." The letter did not deny that such promises had been made in the past.

In his deposition Guess admitted that there was no time during 1969 and 1970 when TGS did not have a source of potash. During 1969, TGS purchased an interest in a Canadian mine located at Allan, Saskatchewan. Under the purchase agreement TGS was not permitted to take production from the Allan mine prior to January 1, 1970. As of that date, however, the Allan mine apparently became TGS's principal source of potash. During January and February 1970 the Moab mine continued to produce but at a reduced rate of between four and five thousand tons per month, most of which was derived from "cleaning up" operations.

By Order of Council 1733/69, dated November 17, 1969, the Province of Saskatchewan promulgated certain "Potash Conservation Regulations, 1969." The regulations were published in the Saskatchewan Gazette on November 21, 1969. Four days later, acting pursuant to the regulations, the Saskatchewan Minister of Natural Resources established a floor price of 33.75¢ (Canadian) per unit for potash produced in Saskatchewan.[1] Adherence to the floor price apparently was a prerequisite to obtaining a license to produce or dispose of potash.

Cooper testified that during January and February 1970 he attempted to obtain potash from several sources other than TGS. He was successful in obtaining three cars of coarse at 21½¢ but these were not acquired from a producer such as TGS but from a customer of another producer. He was unable to purchase any more potash at the price quoted in his alleged contract. Cooper also testified in response to a question as to the prevailing price of granular potash in January that there was some being shipped at twenty-one cents and some at thirty-five cents.[2] He also testified that on February 20, 1970, the date on which Guess wrote the letter indicating the order would not be filled, the prevailing prices were 35¢ and 37¢.

The only other evidence pertaining to market price was supplied by Bryan Guess, who testified that the price during January, in and around Windsor, Illinois, was 21¢ to 26¢ for coarse and 2¢ higher for granular. Guess indicated that "some" potash was available at these prices from suppliers other than TGS during January and February 1970. We assume that prices quoted were the mine f.o.b. prices inasmuch as the freight charges from Utah to Illinois as reflected in exhibits was an amount greater than the price of the product itself. We do not know whether the prices testified to by Guess were market prices for sales made in January or whether these were merely prices on delivery in January pursuant to contracts made earlier and still in effect.[3]

The action was tried before the district court without a jury on October 26, 1971. TGS rested its case without introducing any evidence regarding interest upon the amount admittedly owed TGS on the counterclaim. TGS's brief to the trial court, filed December 28, 1971, was

1. No evidence was produced as to the value in United States funds of 33.75¢ Canadian. Guess testified that the price applied to standard grade potash which was a lower grade than either coarse or granular.

2. The district court had permitted testimony that other producers had told Cooper that the only people they were shipping to at the 22¢ level were people who already had contracts with them. This testimony being hearsay was only admitted for the purpose of showing that a conversation had taken place but not for the truthfulness of the statements. We therefore will give no consideration to the statements; however, we do note them as explanatory of what Cooper obviously meant when he testified shortly after referring to the statements that in January some potash was shipped at twenty-one cents.

3. Plaintiff did not cross examine Guess. A continuing pattern of objections to his testimony on direct examination clearly did not aid the quest for the truth in this bench trial.

also silent with respect to interest. Seventeen months after trial, on March 30, 1973, the court filed its memorandum opinion finding for defendant TGS on the plaintiff's complaint and ordering "that judgment be, and is hereby, entered for the defendant on its counterclaim in the stipulated amount of $105,907.85 and that costs be assessed against the plaintiff." In short, the court was as silent on the interest question as had been the parties.

The appeals were entered from the judgment order of March 30, 1973. In No. 73–1486 Neal-Cooper appealed from the judgment favorable to TGS upon the principal claim. No. 73–1503 represents TGS's cross-appeal from the court's failure to award interest upon the counterclaim. TGS did not file a motion to alter or amend the judgment, which must be filed within 10 days of judgment. Rule 59(e), Fed.R.Civ.P. Rather, one day after filing its notice of appeal but before either appeal was docketed in this court, TGS filed a motion "for relief from judgment under Rule 60." This motion requested the court to vacate the March 30 judgment and to enter a revised judgment "to include interest from and after October 26, 1971," i. e., from the date of the parties' stipulation concerning interest (also the day of trial). TGS also filed a separate motion on May 10, 1970 requesting an evidentiary hearing regarding interest on the theory that the matter of interest had been reserved by the stipulation for hearing at a later date. After conducting a hearing on the two motions, the court entered an order denying both, from which TGS also has appealed (No. 73–1558).

## II. APPEAL NO. 73–1486

### A. *Formation of the Contract*

TGS argued both here and in the court below that the document signed by Guess and Cooper in November 1969 never ripened into a contract because it was never accepted at the TGS New York office as required by the document itself. TGS also relies upon the language in the December 2 order regarding changes or amendments as proof that Gary Cooper did not believe a contract existed at that time. In the alternative, TGS argues that even if there had been a contract (1) the order of December 2 did not conform with the requirements of the contract and constituted an anticipatory repudiation of it; (2) the enactment and implementation of the Canadian potash regulations excused performance both under the exculpatory clause of the contract and under the doctrine of impracticability embodied in § 2–615 of the Uniform Commercial Code (U.C.C.); and (3) Neal-Cooper failed to prove damages in the manner required by the U.C.C.

The district court found that the parties' minds never met and no contract therefore came into being. The court based its holding on several grounds: there was no proof that the contract had been accepted in New York; even if there was a custom for Guess in the regional office to have final authority to approve contracts, Neal-Cooper was unaware of the custom and had no cause to rely upon it; plaintiff returned both copies at defendant's request, indicating that it did not believe it had a contract; and the lack of belief was further evidenced by the words on the December order referring to "any changes or amendments to our contract." The district court also disagreed with Neal-Cooper's contention that the contract was validated by partial performance finding that the November sale could not have been made pursuant to a written contract since shipment was made before Neal-Cooper signed. Finally, the district court found that TGS had never accepted the December order as such so as to create a contract separate from the signed document. We agree with the last finding.

▪ We need look no further than the deposition of Guess to determine that in the legal concept of the phrase there was a meeting of the minds of the parties. Whether Neal-Cooper knew or not of the internal corporate protocol for contract approval by TGS is immaterial. The plain fact is that TGS as a corporation

did approve the contract and chose to disregard the printed words in its contract concerning New York geographical approval. Guess's authority to execute the contract on behalf of TGS was stipulated. At the time in question he was sales manager for all domestic sales. It was his title of "manager of sales" that was printed on the TGS form of sales contract. He had the ultimate authority in the corporation to determine prices and, of course, the bone of contention in the present case is whether TGS was obligated to the prices in the written contract. In his own words, "[n]o one had the authority to set prices but me" and the salesmen would have to sell at a price that he had set.

The normal procedure had been to have the contract go first to the customer "for his signing, returned to the area office and the area office sends it to either New York or Raleigh [Guess's office location] now for final execution and then the executed copy is returned to the customer." In the present case, the order of signing was reversed but the TGS approval was just as complete and final as it would have been if the reverse and normal order of signing had been observed. It is apparent that if the area office in the present case instead of losing the contract had forwarded it to New York it would have been sent on to Raleigh and it is not unreasonable to believe if that had happened that Guess would have been wondering why it was coming back to him when he had already executed it.

We do not give any significance to the fact that someone in the field, apparently following normal practice and overlooking the fact that TGS had already approved, requested both copies be returned. Although complying with this request, Cooper was foresighted enough to preserve a photostatic copy. We find it more significant that there was no place on the form contract for approval by New York. The only place for signature on behalf of TGS was the one line which was in fact signed by Guess who had the final authority in setting prices.

As to the reference to changes or amendments contained in the December teletyped order, this was nothing more than a recognition that if TGS exercised its contractual right to impose a general price increase upon 15 days notice, TGS reserved the right to change the shipping instructions.

Since we find that neither of the last two mentioned matters upon proper analysis have any bearing on whether a contract had been entered because they do not reflect a lack of belief on Neal-Cooper's part that it had a contract, we need not decide whether a subjective belief that a contract has not been entered can have the effect of negativing the existence of a contract legally executed.

Our holding does not conflict with the cases upon which TGS places reliance. In Senner & Kaplan Co. v. Gera Mills, 185 App.Div. 562, 173 N.Y.S. 265, 269 (1918), the court found that no duty rested upon a seller to notify a buyer within a reasonable time that it would not accept an order that was received from a salesman who had neither actual nor apparent authority to bind the seller in contract. In Markmann v. H. A. Bruntjen Co., 249 Minn. 281, 81 N.W.2d 858 (1957), the court held that it would not hold the buyer bound in contract where the purported home office approval was actually a counteroffer. The correspondence in Euclid Engineering v. Illinois Power Co., 79 Ill.App.2d 145, 223 N.E.2d 409 (1967), alleged to constitute a contract, was always in very conditional terms. Finally, in Kuzmeskus v. Pickup Motor Co., Inc., 330 Mass. 490, 115 N.E.2d 461 (1953), the court held that a buyer will not be bound where he had signed an order stating that it was not valid until approved by an officer of the seller with a space provided for the officer's signature, and the officer had done nothing to communicate acceptance.

### B. Anticipatory Repudiation by Neal-Cooper

TGS argues that even if the contract should be held to be binding, the shipping instructions issued by Neal-Cooper

constituted an anticipatory repudiation of it. This is a four-pronged contention: 1) the quantity requested in the shipping instructions exceeds the quantity specified in the contract; 2) the shipping instructions call for TGS to prepay shipping expenses, and TGS had no obligation to do so; 3) the shipping instructions call for shipment to places other than Neal-Cooper's plant, which is specified in the contract; and 4) the quantity requested was unreasonably large to be delivered in one month.

Section 2–610 of the Uniform Commercial Code gives a party a right to remedies if another party repudiates a contract with respect to performance not yet due if the loss of performance will substantially impair the value of the contract. If the shipping instructions did constitute anticipatory repudiation by Neal-Cooper, TGS's refusal to ship pursuant to the instructions was proper; otherwise it was not.

Section 2–610 does not define "repudiation," but the draftsmen's comments state: "anticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." U.C.C. § 2–610 Comment 1. The draftsmen anticipated TGS's contentions in this case: "a demand by one or both parties for more than the contract calls for in the way of counter-performance is not in itself a repudiation . . . . However, when under a fair reading it amounts to a statement of intention not to perform except on conditions which go beyond the contract, it becomes a repudiation." U.C.C. § 2–610 Comment 2.

■ We believe these comments to be a correct statement of New York law. The New York Law Revision Commission Report, cited by defendant, similarly stated: "[i]nsisting on terms not in the contract has been held in New York to constitute an anticipatory repudiation." The two leading New York cases on this point are Wester v. Casein Co. of America, 206 N.Y. 506, 100 N.E. 488 (1912),

and Estes v. Curtiss Aeroplane & Motor Corp., 191 App.Div. 719, 182 N.Y.S. 25 (1920), aff'd per curiam, 232 N.Y. 572, 134 N.E. 576 (1922). In *Wester* the parties had been involved in an on-going dispute concerning shipment and payment. Finally, the plaintiff demanded performance in accord with the terms of the contract; defendant demanded shipment and payment under terms materially different from the contract. The court held that defendant's demand constituted anticipatory repudiation. In *Estes,* Estes objected to the strictness of Government inspectors in refusing lumber delivered by his firm and said that he did not desire to enter further contracts with Curtiss; nevertheless, Estes entered a new contract after Curtiss agreed to inspections of lumber delivered under the contract by a particular employee of Curtiss, rather than a Government inspector. Later, insistence by Curtiss on government inspection of the shipments was held to constitute anticipatory repudiation. The issue thus becomes whether the shipping instructions issued by Neal-Cooper constituted anticipatory repudiation under this law.

The quantity ordered by Neal-Cooper was not in excess of the quantity specified in the contract. The shipping instructions were for 10,000 tons of potash; the contract was for 10,000 tons of potash. TGS argues that shipments made in November and December were also under the contract and that therefore the limits were exceeded. TGS earlier argued that these shipments were not made pursuant to the contract and that they did not validate it by partial performance under U.C.C. § 2–204. The district court found that these shipments were not pursuant to the contract and was not clearly erroneous in doing so. We accept the district court's finding in this respect.

■ We find little merit in the second and third aspects of the contention here under consideration. Neal-Cooper argues that it is established by evidence that prepayment of freight and shipping to a place other than its plant at Wind-

sor were in accord both with common practices in the industry and the previous dealings of the parties.

Under the Code there are three types of parol evidence which may be introduced to interpret a contract: usage of trade, course of dealing, and course of performance. A usage of trade is any "practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question." U.C.C. § 1–205(2). A course of dealing is "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." U.C.C. § 1–205(1). A course of performance occurs where the contract "involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other . . . ." U.C.C. § 2–208(1).

Section 2–208 defines the role these types of evidence play in interpreting a contract:

"(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade." U.C.C. § 2–208(2)."

As stated by Judge Cummings in V-M Corp. v. Bernard Distributing Co., 447 F.2d 864, 868 (7th Cir. 1971), "[a]part from waiver . . . Section 2–208 expressly limits the relevance of course of dealings to construction of contractual terms." We therefore turn to the course of dealings to see if there is any fundamental conflict with the express terms of the contract and if not whether the course of dealing will aid the plaintiff.

We do not need to look far for a course of dealing for it occurred at the very time that the contract was in the process of formation and which course of dealing we have held hereinbefore not to have been performance under the contract. Some of these pre-contract shipments were made not only to destinations other than Windsor but to consignees other than Neal-Cooper. All were made on a prepaid freight basis with the plaintiff being billed for the amount of the freight. One of the destination towns listed in the December teletype had been the point of delivery to which TGS had made shipment in the course of its November dealing with Neal-Cooper.

Even without a course of dealing, we find nothing in the language of the contract repugnant to the place or manner of shipment specified in the December shipping instructions. One of the shippings was to have been directly to Neal-Cooper at Windsor and there could be no claim whatsoever that this destination was not in the contract. Yet TGS made no effort to fill this shipment under the contract. The other two destinations were in the state of Illinois but were to be sent to "Neal-Cooper Grain Co." at those destinations. The contract specifies that the "buyer agrees to buy and receive at its plant(s)." The "(s)" had not been stricken from the contract. Had this been done there might have been some additional basis for defendant's argument on the point. As it was, since TGS's only obligation was to load on cars at Utah, it could have made no conceivable difference to it as to what the destination in Illinois might be.

Also, the contract does not preclude prepayment of freight, it merely provides that shipment would be "F.O.B. cars seller's plant Potash, Utah." U.C.C. § 2–319(1)(a) provides that when the term is F.O.B. the place of shipment, the seller must at that place ship the goods and bear the expense and risk of putting them into the possession of the carrier. Subsection (c) provides that when the term is also F.O.B. car, as it was here, the seller must load the goods on board.

In the New York annotations to this section, 62½ McKinney's Consolidated Laws of New York, Part 1, it is stated that the term F.O.B. while not defined in the U.C.C., "states commercial understanding that the term defines the point to which the seller has responsibility for transportation of the goods free of transportation expense to the buyer." It was obvious from the course of dealing between the parties that while TGS had the obligation to put the product on the railway cars the cost of shipment was to be repaid by Neal-Cooper. Indeed, as mentioned hereinbefore, if the shipper had not been reimbursed he would have received nothing for the product sold as the freight charges exceeded in amount the cost of the goods.

In sum, these two contentions strike us as in the nature of afterthoughts on the part of the defense in arraying its litigation arsenal. The letter of February 20, 1970, mentions nothing about the claimed variance from the contract but as an initial matter relies upon the fact that the original signed copy of the contract had never been received by TGS.

■ The fourth contention of TGS under the present point presents a somewhat more arguable basis, at least as a matter permitting something less than full performance even though not persuasive of the existence of anticipatory breach. The defendant argues that "[d]emanding the entire season's supply in one month was commercially unreasonable and not made in good faith as

required of merchants under the Code considering the fact that the parties contemplated an installment contract with deliveries to be spread over the entire fertilizer season of eight months."[4]

At the outset, we do not know where TGS finds support in the contract it refused to recognize or elsewhere for the statement that the parties contemplated an installment contract. The terms of the contract only provided for the sale of a specified quantity for the period of 8 months. Sometime during that period, Neal-Cooper had to take delivery on the specified quantities. It elected in December to take delivery on the entire amount of course in January, a time within the limits of its obligation.[5]

It appears obvious that the parties did not contemplate the delivery of 10,000 tons of coarse in one shipment but rather delivery in several lots. § 2–307 U.C.C. A specification of the particulars of performance "must be made in good faith and within limits set by commercial reasonableness." § 2–311(1) U.C.C. Where the contract involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement. § 2–208(1) U.C.C. TGS certainly did not accept the shipping instructions and did not affirmatively acquiesce. It merely

4. Elsewhere in its brief, TGS asks us to take judicial notice that peak demands for fertilizer are likely to be in March and April and certainly not in January. If the peak demand begins in March, it does not strike us as being unbusiness-like or beyond the contemplation of the contract for Neal-Cooper to lay in its stock only 2 months in advance, particularly when the contract provided that the specified prices were only "through January 31, 1970," and further provided, in any event, that there could be a general price increase upon 15 days notice. Apparently TGS who did write the contract was saying on one hand that we will sell you 10,000 tons of coarse at a fixed price but on the other hand that price does not really apply to all 10,000 since it is only good until next January and

you have to spread the shipments out through 8 months.

5. The record is not clear as to the January 20 shipping order for 1,020 tons of coarse and 1,570 tons of granular. This was the first shipping direction as to the granular and would have been within 15 days after receipt of the notice of a general price increase. The coarse material ordered shipped would have exceeded that specified in the contract since that entire amount was ordered in December. From the language of the teletype we may assume that some of coarse ordered in December had been resold to customers and shipment was being redirected to the ultimate purchasers.

ignored. And it certainly did not object to Neal-Cooper, nor inquire as to what contract agreement Neal-Cooper was referring in its December teletype although Neal-Cooper was a regular customer. Quite apparently TGS smugly took refuge in its mistaken belief that a signed copy of the contract had never been returned to it.

Under the circumstances of this case, we hold that there has been no demonstration of commercial unreasonableness and that the belatedly raised issue need be given no further attention on remand.

## C. *Performance Not Excused*

In early January 1970 TGS closed its Moab mine, which previously had been its principal source of supply. Only small quantities of potash were thereafter produced from that mine during cleaning up operations. The Allan mine in Canada became TGS's principal source of supply. Canadian governmental regulations did not permit TGS to operate the Allan mine before January 1, 1970, and after that date did not permit TGS to sell potash below the regulated price of 33.75 cents a unit for standard potash.

The contract contains an exculpatory clause which reads: "The Seller shall not be liable for failure or delay in shipments or completion of a shipment . . when such failure or delay is caused by . . . the operation of statutes or law, interference of civil or military authority or other causes of like or different kind beyond the control of the seller. . . . " Under the Uniform Commercial Code three conditions must be met before a party is excused from performance. TGS correctly states them in its brief: "(1) a contingency must occur (2) performance must thereby be made 'impracticable' and (3) the non-occurrence of the contingency must have been a basic assumption on which the contract was made." See U.C.C. § 2–615. TGS cites the Draftsmen's Comments in support of its position, but the support is not there. The relevant comments provide:

"Neither is a rise or a collapse in the market in itself a justification, for that is exactly the type of business risk which business contracts made at fixed prices are intended to cover. But a severe shortage of raw materials or of supplies due to a contingency such as . . . unforeseen shutdown of major sources of supply . . which either causes a marked increase in cost or altogether prevents the seller from securing supplies necessary to his performance, is within the contemplation of this section." (citations omitted.)

. . . . .

. . . There is no excuse under this section, however, unless the seller has employed all due measures to assure himself that his source will not fail." U.C.C. § 2–615 Draftsmen's Comments 4–5, citing the classic New York case of Canadian Industrial Alcohol Co. v. Dunbar Molasses Co., 258 N.Y. 194, 179 N.E. 383 (1932).

As TGS correctly states, the Code abandons the old rule of impossibility of performance or act of God and substitutes for it the rule of commercial impracticability. The case of 407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp., 23 N.Y.2d 275, 296 N.Y.S.2d 338, 244 N.E.2d 37 (1968), cited by Neal-Cooper, is not in point because it is not decided under the Code (services were involved, not the sale of goods) and a strict standard was applied. Nevertheless, impracticability will not be deemed an excuse unless the intervening circumstances are ones which the parties assumed would not occur. Maple Farms, Inc. v. City School District of the City of Elmira, 76 Misc.2d 1080, 352 N.Y.S.2d 784 (Sup.Ct.1974). The fact that performance has become economically burdensome or unattractive is not sufficient for performance to be excused. United States v. Wegematic Corp., 360 F.2d 674 (2d Cir. 1966); Transatlantic Financing Corp. v. United States, 124 U.S.App.D.C. 183, 363 F.2d 312 (1966) (Suez Canal closing case.)

In our opinion, the present case is one in which performance may have be-

come burdensome but was not excused. Performance by TGS was not shown to have been impossible. There was no showing that the Moab mine could not have produced sufficient potash to fill the contract. Indeed, in its new price list which by its terms was to be effective on January 1, 1970, this significant statement appears: "Shipments to be at Seller's option from either Allan, Saskatchewan; *Moab, Utah or Seller's warehouses.*" (Emphasis added.) Further, there was no showing that the shipments could not have been made through an "on exchange" transaction referred to by Mr. Odum of TGS. In an "on exchange" transaction one producer ships for another and then the other takes back from the other producer's mine. If an on exchange transaction would have violated the Canadian Government regulations, there still was no showing that TGS could not have purchased potash, albeit above the contract price, and filled the Neal-Cooper order.

Finally, we note that at the time Guess signed the contract for TGS, that company had been aware for many months that as of the following January it would turn to the Allan mine for its principal source of supply. It was TGS's decision to switch to the Canadian mine, not the governmental regulation of prices which caused the claimed price increase. The red flag of possible governmental controls is discernible in the Mineral Resources Act of Saskatchewan, 1965. Regulations issued in that province as late as March 1970 as introduced into evidence by TGS would appear to have no material bearing on the present issue. We will not allow a party to a contract to escape a bad bargain merely because it is burdensome. After one party has entered a contract for supply, he ceases to look for other sources and does not enter other contracts. To make duplicate arrangements for supply under such circumstances might assure the delivery of the material desired but also might well be productive of double liability and inability to dispose of the double deliveries. Barring circumstances not existent here, the buyer has a right to rely on the party to the contract to supply him with goods regardless of what happens to the market price. That is the purpose for which such contracts are made.

Having determined that a contract was formed between the parties, that performance by TGS was not excused, and that the contract was breached, we now turn to the question of damages.

### D. *Damages*

■ Both appellant and appellee discuss the question of cover and mitigation of damages in their briefs. This discussion is irrelevant. Failure to cover does not bar any remedy except consequential damages. U.C.C. §§ 2–712, 2–715(2)(a). Consequential damages are not at issue on this appeal.

■ Section 2–713 provides that the measure of damages for nondelivery or repudiation is the difference between the market price at the time buyer learned of the breach and the contract price plus incidental (and consequential) damages less any savings as a consequence of seller's breach. The market price is to be determined at the place for tender. Neal-Cooper argues that damages should be determined by multiplying the quantity to be received under the contract by the difference between the contract price and the new price list published by TGS. TGS objects that no evidence was introduced as to what the price of potash was at Utah, which they interpret to be place of tender, and that no notice was given as required by § 2–723(3) if market price is going to be shown by showing the prices in different markets or at different times. TGS also objects that plaintiffs' proof lacks necessary specificity regarding time and place.

As in any case of disputation which has gone into litigation, the desirable result would be to put the matter to rest at least after resort to the appellate level. While we are able to resolve some of the controversies concerning damages, the record is sufficiently inconclusive as to others and requires a reversal and

remand for the determination of the damages, if any, which were suffered by the plaintiff, the district court not having had the occasion to address this subject because of the result it reached on the trial.

As an initial matter, we reject TGS's position that the only pertinent market price was that which existed at Utah. TGS's insistence upon the applicability of the Utah market price because of lack of notice under § 2–723(3) might well have been a hanging petard for it because the company's own revised price list showed the higher prices at Utah as of January 1, 1970, which price list, of course, was not applicable to persons who had contracts at a lesser price until the expiration of the 15 day notice period. TGS is saved, however, by the fact that no objection was made to the lack of notice at the trial and both parties introduced testimony as to the market price in the Midwest area. In any event, as far as we can see from the record the price in the Midwest and Utah would have been the same for the product itself since the pricing was not done on a delivered basis but rather on an F.O.B. source basis.

Neal-Cooper is not entitled, as it now contends, to damages in the amount of the difference between the revised price list and the November contract price. There was testimony that some sales were made at the time of the breach, which we would consider to be at the time of failure of delivery, at a lower price than the revised market price of January 1, 1970. These sales may well have been directly or indirectly resulting from sales pursuant to earlier executed contracts and if so, of course, they would not be a basis for determination of a willing buyer—willing seller fair market price in January. Also, upon trial of the question of damages on remand it may be determined that some potash was available at the price specified in the November contract but not enough to fill the order placed in December. These factual matters will have to be resolved by the trier of fact pursuant to the applicable provisions of the Uniform Commercial Code.

The district court will also have to give consideration to the possible impact of the revised price list. The uncontroverted testimony was that it was not received by Neal-Cooper until January 17, 1970. As we have noted, the contract provided that a revised price list would not become effective until 15 days after receipt. Since damages will have to be retried, TGS should have the opportunity of showing an earlier receipt date if such is the fact. Also, in our opinion, the fact that the typed prices in the November contract were specified as being "through January 31, 1970" will not override the privilege reserved by the seller of revising prices generally on 15 days actual notice.[6]

■■■ The burden of proving its damages will, of course, rest upon Neal-Cooper.

### III. THE CROSS-APPEALS

The procedural posture of the case below regarding the fact that the judgment did not provide for prejudgment interest which resulted in two cross-appeals has been set out heretofore in this opinion and will not be repeated. The district court apparently did not include any prejudgment interest because no evidence was offered by TGS on the subject "the question of the liability for and the amount of interest due on said [stipulated amount of] debt [having been] reserved."

■■■ In No. 73–1558, TGS challenges the denial of its post-trial motion to offer evidence establishing the dates on which payments became due on the shipments which gave rise to the counterclaim thereby establishing the right to

---

**6.** Neal-Cooper's proviso in its December teletype delivery order that any changes or amendments to the contract would be the basis of a reserved right to change the shipping instructions appears to support a belief on the part of Neal-Cooper that the right of revising prices generally on 15 days actual notice was superior to the price specification "through January 31, 1970."

interest from the date the payments became due to the time of trial. TGS contends that the trial judge separated the issues of Neal-Cooper's claim and the counterclaim under Rule 42. TGS admits that nowhere was there an express separation but argues that a separation could be inferred from the circumstances. The issue of an evidentiary hearing on interest was not raised until more than a month after entry of judgment by the trial court. We are of the opinion that it was clearly within the discretion of the trial court to deny TGS's motion for an evidentiary hearing at that time. The record does not indicate other than that TGS was not deprived of the opportunity of offering evidence at the time of the trial to support the granting of pretrial interest.

In 73–1558, TGS also contends that its post-trial Rule 60 motion was improperly denied. Since that motion sought only interest from the date of trial until judgment we do not need to consider Rule 60 questions presented because of our disposition of 73–1503.

In that appeal TGS relies alternatively on two sections of Chapter 74 of the Illinois Revised Statutes.[7] Section 3 provides:

"Judgments recovered before any court or magistrate shall draw interest at the rate of 6% per annum from the date of the same until satisfied. When judgment is entered upon any award, report or verdict, interest shall be computed at the rate aforesaid, from the time when made or rendered to the time of rendering judgment upon the same, and made a part of the judgment."

Section 2 provides:

"Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing

. . . [or] on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance . . . ."

We are not persuaded by TGS's argument, despite its ingenuity, that a finding by a court is equivalent to an "award, report or verdict," that a stipulation is equivalent to a finding and that therefore the stipulation involved in the present case is equivalent to a verdict upon which judgment has been entered thereby entitling TGS to 6% interest. We do not read the Illinois legislation as being this all-encompassing and no Illinois authority to the contrary has been presented to us. The statute while giving some flexibility in its reference to "award, report or verdict" appears clearly to us to refer to some action by the court on which the court has subsequently entered judgment. The stipulation is a creature of the parties and while binding upon them does not rise to the stature specified in the statute for its applicability. In the alternative, TGS argues that it is entitled to 5% interest from the date of the stipulation to the date of judgment pursuant to § 2 of the Illinois statute quoted above. The issue under this section is whether the stipulation is an "other instrument of writing" or a "settlement of account" within the contemplation of the statute. We need not decide whether the stipulation was an "other instrument of writing" within the meaning of the statute because we hold that the stipulation was a "settlement of account" within the meaning of the statute. We reverse and remand for a determination of the amount of interest from the date of the stipulation to the date of entry of judgment.

We believe that the essence of a settlement of account is an agreed determination of the amount of a liability. See Haight v. McVeagh, 69 Ill. 624, 629

7. The parties on this appeal have agreed that if interest is allowable the law of Illinois will be the governing law. The law of New York was stated in the trial court to be applicable to the Neal-Cooper claim but nothing was said as to the claim for interest. We will follow the law of the forum on this matter since the subject is untouched either in the pleadings or stipulation. Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

(1873); Clark v. Dutton, 69 Ill. 521 (1873). Neal-Cooper argues that the question of interest was expressly reserved by the stipulation. We read the statement in the stipulation as referring to interest prior to the date the stipulation was executed, which required proof of facts, and not to interest subsequent to the date of the stipulation.

Neal-Cooper argues that this decision would discourage stipulations because litigants would wish to avoid the running of interest and that stipulations should be encouraged because they save the parties and the courts time and money. We agree that stipulations are to be encouraged. We cannot agree that this decision so conflicts with this policy that we should read the statute more narrowly than what its intent appears to us to be.

Here, within the plain words of the statute the parties had ascertained the balance due and owing and settled the account. Neal-Cooper's policy argument, if it has validity, should be addressed to the legislature. It certainly is not persuasive for the purpose of construction of this statute. The accrual of interest on money owing in a specific amount and past due is a part of everyday life of the commercial world. Of course, if the principal amount were in dispute, the situation would be different and we do not conceive that where that dispute exists that the stipulation would be entered. When it is not in dispute, as it was not here, we would hopefully assume that lawyers would not engage in frivolous litigation. The policy argument of necessity is predicated on a contrary assumption. In any event, if proof had been offered Neal-Cooper would have been also liable for interest from some time following the sales until judgment, not just from the date of the trial stipulation.

For the reasons set out herein, in No. 73–1486 we reverse and remand for further proceedings to determine the amount of damages, if any, to which Neal-Cooper is entitled and in No. 73–1503 we reverse and remand with directions that the interest be computed at 5% from the date of stipulation to the date of judgment and that the judgment be modified accordingly. The appeal in No. 73–1558 is dismissed. Each of the parties will bear its own costs.