JOHN BURNS CONSTRUCTION COMPANY, Plaintiff-Appellee, *v.*
INTERLAKE, INC., Defendant-Appellant.

First District (2nd Division)    No. 80-2112

Opinion filed March 23, 1982.

Wildman, Harrold, Allen & Dixon, of Chicago (Thomas D. Allen and Robert E. Kehoe, Jr., of counsel), for appellant.

Pope, Ballard, Shepard & Fowle, of Chicago (Thomas J. Regan and Mark T. Dunn, of counsel), for appellee.

JUSTICE PERLIN delivered the opinion of the court:

John Burns Construction Company (Burns) sued Interlake, Inc. (Interlake), to obtain further payment for a sewer project. Although Interlake had paid Burns the stated contract price of $68,117, Burns' three-count complaint sought an additional $149,000 for excavating problems encountered on the job. Count I alleged fraud, that Interlake had misled Burns as to the nature of the subsoil; count II alleged mutual mistake, that the parties were mistaken about the condition of the subsoil, and sought rescission of the contract and *quantum meruit* recovery; count III alleged contract extras, *i.e.*, that Interlake had separately agreed to pay for Burns' extra effort because it was outside the scope of the contract. In a bench trial the court rescinded the contract and entered judgment against Interlake in the amount of $130,406.25 on count II, mutual mistake, and in favor of Interlake on counts I and III. Interlake appeals from the judgment entered on count II, contending (1) that the trial court erred in rescinding the contract on the ground of mutual mistake, and (2) that assuming the contract was properly rescinded, the court improperly applied a *quantum meruit* measure of damages. For the reasons which follow we affirm the trial court's judgment rescinding the contract, vacate the order awarding damages and remand the cause for a hearing to determine damages in accordance with the views expressed herein.

Interlake operates a pig iron plant on the south side of Chicago, adjacent to the Valley Mould and Iron Company. Servicing the site is an underground sewer network which collects waste water from a variety of points and discharges it into the Chicago sewer system. Due to increased usage in the early 1970's, the final branch became a critical bottleneck and, because of potentially dangerous backups, Interlake needed to supplement the flow capacity with a new pipeline parallel to the existing branch.

Prior to soliciting bids Interlake knew that the subsoil in the area to be excavated might contain cinders, large chunks of iron and coal called "skulls" or "buttons," buried railroad ties, abandoned concrete foundations and concrete-like slag. None of the bidders was apprised of these conditions. This was attributable to Interlake's consistent policy of

inviting contractors to bid for excavation on the basis of "virgin soil," *i.e.*, the natural condition of the subsoil assuming there had been no human tampering. Interlake explained that it adopted this policy, which it had followed in 50 to 75 instances prior to mid-1972, to insure comparable bids, given the uncertainty as to the exact subsoil conditions along the proposed route. Interlake specifically advised Burns to calculate its bid on the assumption that the work was to be done in virgin soil. Interlake did not inform Burns that there was a break in the existing sewer line between manhole No. 2 and manhole No. 1 or that periodically waste water would fill up and back out of manhole No. 2 at a rate in excess of 1500 gallons per minute.

On July 11, 1972, Burns submitted a bid of $108,000 for the sewer project together with other unrelated work which was not performed because of Burns' later disputes with Interlake. At Interlake's direction, the bid was expressly based on the assumption that "all ground shall be virgin." The bid also stated that "[i]t is understood that this proposal, upon acceptance thereof, will become a contract; * * * ." In late August or early September 1972 Interlake accepted Burns' low bid. The written document evidencing this offer and acceptance was dated September 6, 1972, but was not signed by both parties until November 25, 1972, 19 days after work had commenced.

On September 4, 1972, Burns sent to Interlake a schedule of "price lists for labor, equipment and unit work that will be a supplement to our quotation of July 11, 1972 [which was based on the assumption of virgin soil], for any additional work that may occur." This schedule was eventually made part of the contract itself, and paragraphs "THIRD" and "FOURTH" of the contract provide an arrangement for time and material charges for work not covered by the scope of the original contract.

Burns obtained construction permits from the Metropolitan Sanitary District, the Environmental Protection Agency and the City of Chicago, and began moving materials and equipment onto the job site on November 6, 1972.

Prior to the actual commencement of work, the parties met at the job site and discussed the possibility of nonvirgin subsoil conditions. They agreed to tabulate all nonvirgin work on Burns' own time and material sheets, all of which were put in evidence. Richard Thompson, Burns' executive vice-president and secretary, testified that he was advised by James Bitner, Interlake's plant engineer, that Burns might encounter slag underneath the ground. Thompson agreed that any extra work required because of the presence of that slag and "all non-virgin problems of whatever nature" would be covered by the written time and material sheets. Interlake signed all time and material sheets Burns submitted. Their total value was $41,299.91. At the same meeting Interlake's project

engineer, Richard Draus, advised Burns that Bitner would be Interlake's representative at the job site. Draus said that Bitner had authority to approve any additional payments for Burns.

Before the contract was signed on November 25, 1972, Burns had dug test pits to locate existing underground utilities and had begun to install well points to dewater the subsurface along the path of the new sewer. Burns found congealed slag which had to be broken up by "hard digging," *i.e.*, digging using backhoes, pneumatic air tools, jackhammers and other equipment. Interlake agreed to pay for this extra work and gave Burns approximately $6,000 for it.

On November 25, 1972, Burns signed the written contract. Although Burns had estimated the cost of the sewer work in question at $77,800 (at Interlake's request, Burns submitted a total bid which did not isolate Burns' costs for the sewer project alone), Interlake's contract assigned a figure of $68,117 to that work for internal budgeting reasons. Burns had no objection to this allocation so long as it was understood that when all the work contemplated was completed, Burns would receive the total contract price, including the $77,800 Burns estimated for the sewer project.

Near both ends of the new sewer route were railroad tracks which could not be interrupted because they were vital to Interlake's operations. Thus, while the middle portion of this 465-foot run could be dug by open trenching, the end portions required underground tunneling using an auger to bore a hole, followed simultaneously by a steel casing to serve as a permanent shell. Burns subcontracted the tunneling operation to Armco Steel Company.

In the course of boring westward on the second tunnel run, Armco's auger chopped through an intersecting eight-inch sewer line from Valley Mould and Iron which Burns was supposed to have sealed as part of its contract with Interlake. This occurred on December 29, 1972. The water from that break flowed first into the 42-inch casing and then into the "push pit" where the boring equipment and hydraulic rams operated. The water was pumped out of the push pit and off the premises. Witnesses for both Burns and Interlake testified that this break was sealed within a day and a half, after which Armco immediately resumed boring.

After January 1, 1973, Armco continued to push its 42-inch casing west some distance beyond the Valley Mould and Iron sewer line without difficulty. Thereafter, due to loose cinders in the soil, the casing began to rise off the grade as the soil collapsed around it. To overcome this new and unknown soil condition Armco was required to "swallow" the newly installed 42-inch casing with a 48-inch casing, withdraw and scrap the original 42-inch casing and replace it with a new 42-inch casing realigned

at the proper elevation. Bitner observed this work, which took approximately a week to complete, on a daily basis but did not instruct Burns or Armco to stop working. Burns did not submit any time and material sheets for this corrective work. Drilling was resumed and continued without incident for approximately 100 feet.

On January 19, 1973, the work again came to a halt because excessive water was running into the Armco casing causing it to seize. Henry Fisher of Armco testified that there was a stream of warm running water six inches wide and one-half to three-quarters of an inch deep. The water and cinders were voiding the soil above the casing so that Fisher could see the top of the casing 10 to 12 feet below the surface. The parties explored for its source and patched manhole No. 2 but observed no change in the amount of excess water. Because of this problem, another meeting was held at the job site on January 18 or 19. Among those present were John Hayes, vice-president of operations for Burns, Bitner, Interlake's plant engineer, and Henry Fisher from Armco.

Hayes testified that at this meeting Bitner asked whether Burns and Armco were going to be able to finish the job. Hayes said that the excessive water was the problem in continuing, and Armco stated that if the water flow could be stemmed then the work probably could be completed. Bitner said that Interlake was willing to do whatever was necessary to install the sewer. Interlake rejected Burns' request to place the entire project on a time and material basis, but Bitner instructed Burns to "keep track of all our costs on the job." Bitner assured Burns that they "would be compensated fairly for the work done in conjunction with what we [Burns] felt was over and above the work called for in the contract." Fisher testified that Bitner also told Armco that it should move off the job and that it would be reimbursed for its additional costs. Bitner later told Hayes that Burns would be compensated for its extra cost and told Hayes that this situation was very typical for Interlake. Bitner, however, was never informed of any extra charges beyond that which were represented in the time and material sheets.

Bitner testified that the volume of water running into the Armco casing was a "non-virgin" condition and that he agreed to pay for a second dewatering system. This system was installed during a two-week period beginning about January 23, 1973. About the same time Burns, with Bitner's approval, installed an additional manhole (designated manhole No. 1B) which was not included in the contract specifications.

Early in February 1973 Armco, which had moved off the job at Bitner's direction, returned, reset its equipment and pushed another 30 to 35 feet west where Armco again encountered a great amount of warm water flowing into big streams coupled with slag and cinders immediately

under the railroad tracks. Another job site meeting was held. Armco's Fisher told Bitner that Armco's auger could not dig through the soil. Bitner told Fisher and Hayes (Burns' vice-president) that the railroad tracks could not be taken out of service and that Armco should stay on the job. Bitner promised Fisher and Hayes that "regardless" of cost Interlake would "settle at the end of the job." Following these assurances, Armco brought in a special four-foot hydraulic ram and succeeded in forcing the casing an additional 20 feet west to a point just past the railroad tracks. Because of the increasing resistance of the soil, which made further underground tunneling impossible, it was decided to install an additional manhole (manhole No. 2B) at that point and continue the rest of the route by open trench digging to manhole No. 2. Because of the soil condition this trench had to be sheeted with special tongue and groove sheeting which was not part of the job specifications. The same method was used to install the sewer line between manholes No. 2 and No. 2A. Time and material sheets were prepared for this work.

As the sewer work neared completion, Burns began to enlarge the existing manhole No. 2 (to which the new sewer line would connect) and it was then discovered that one of Burns' original well points had pierced one of the entering sewer lines. The parties dispute whether this caused the water problems experienced at the west end of the project.

About the middle of March 1973, several weeks before the job was finished, Richard Thompson, Burns' executive vice-president, gave Interlake's Eric Gross an accounting of the costs Burns had incurred to date and projections of its costs to complete the construction. Gross said that Interlake was very happy to receive them and that they were exactly what Interlake was looking for. Bitner acknowledged that he also received Burns' estimates about March 20, 1973, and knew that Burns was incurring costs of nearly $217,000. Even though he had the authority to do so, Bitner did not stop the work which continued for another month.

On May 4, 1973, Burns presented Interlake with an itemized statement in the amount of $217,647.82. Burns had previously submitted time and materials sheets for $41,299.91. Interlake agreed to pay the stated contract price of $68,117 plus an additional $6,085.77 for hard digging. Interlake refused to pay the costs of patching manhole No. 2, a second dewatering system, an extra manhole, trenching from manhole No. 2B to manhole No. 2A or from No. 2A to No. 2. Interlake's position was that these costs were either unrelated to nonvirgin soil conditions or were incurred because of Burns' own errors. Burns brought suit.

The trial court found that there was a mutual mistake as to the soil conditions, rescinded the contract and awarded Burns $130,406.25. This figure included all of Burns' costs on its itemized bill except overhead and handling charges, less what Interlake had already paid Burns. The court

also entered judgment in Interlake's favor on counts I (fraud) and III (contract extras) of Burns' complaint. This appeal follows.

## I

To rescind a contract because of mutual mistake four elements must be proved by clear and positive proof: (1) that the mistake relate to a material feature of the contract; (2) that the mistake is of such grave consequence that enforcement of the contract would be unconscionable; (3) that the mistake occurred notwithstanding the exercise of reasonable care; and (4) that the other party can be placed in *statu quo*. (*Santucci Construction Co. v. County of Cook* (1974), 21 Ill. App. 3d 527, 531, 315 N.E.2d 565; *People ex rel. Department of Public Works & Buildings v. South East National Bank* (1971), 131 Ill. App. 2d 238, 241, 266 N.E.2d 778.) Interlake does not dispute that the condition of the subsoil was a material feature of the contract. In its first argument, however, Interlake maintains that there was no unconscionable situation and that Burns failed to exercise due care.

With respect to the element of unconscionability, Interlake contends that the parties contemplated and expressly provided for the existence of nonvirgin soil conditions. Based upon the contract documents and the statements of Burns' own representative, Richard Thompson, Interlake argues that the parties agreed that the compensation for extra work necessitated by the presence of underground slag and "all non-virgin problems of whatever nature" would be requested on Burns' written time and material sheets and would be paid according to a predetermined schedule of prices. It appears, however, that the parties abandoned the time and material concept as unrealistic in mid-January 1973 after they began to realize the complexity and magnitude of the problems that actually existed.

James Bitner, Interlake's representative at the job site, testified that the subsoil conditions encountered were never contemplated by the contract, and the evidence amply supports the trial court's finding that the contractual arrangement "had become totally irresponsive to the needs of the January, February and March work that was being done by the Burns Construction Company." Bitner, who had the authority to approve additional payments, told both Burns and Armco to continue with their work and keep track of their costs because they would be paid. He assured them that everyone would be compensated. By its express words and its conduct, Interlake waived the requirement that all extra work was to be paid for on the basis of the written time and material sheets. (See *Joray Mason Contractors, Inc. v. Four J's Construction Corp.* (1978), 61 Ill. App. 3d 410, 411, 378 N.E.2d 328.) Given the facts of this case we believe that the element of unconscionability was established by clear and positive

proof. *People ex rel. Department of Public Works & Buildings v. South East National Bank* (1971), 131 Ill. App. 2d 238, 241, 266 N.E.2d 778; *Wil-Fred's v. Metropolitan Sanitary District* (1978), 57 Ill. App. 3d 16, 372 N.E.2d 946.

Interlake contends further that Burns failed to exercise reasonable care. Interlake asks us to measure Burns' degree of care as of November 25, 1972, the day the written contract was signed, and asserts that by that time Burns was "aware of non-virgin conditions by virtue of actually working on the job as well as what was openly discussed at the pre-job meeting." The predicate for Interlake's contention is that the parties were not contractually bound until November 25, 1972.

Burns' bid, submitted on July 11, 1972, stated that "[i]t is understood that this proposal, upon acceptance thereof, will become a contract, * * *." In late August or early September 1972 Interlake accepted this bid without qualification. It was at that time, therefore, that the parties became contractually obligated. Even if we accept Interlake's date of November 25, 1972, it is apparent that most of the construction difficulties Burns eventually encountered had not yet been discovered.

As of November 25, Burns had resorted to some "hard digging" in locating underground utilities and installing well points. The cost of this digging was only a fraction of the costs Burns later incurred. More significantly, hard digging was only the first in a series of various excavating problems Burns faced. On November 25, 1972, Burns did not have actual knowledge of any other subsoil conditions including loose cinders, sand, a broken sewer line, and the backing up of waste water discharges.

Interlake argues further that under paragraph 17 of the contract Burns was responsible for checking the job site and disclaimed any complaints about the conditions that existed. Neither of the authorities on which Interlake relies, however, involved any misleading representations by the owner or withholding of relevant information.

■■ Paragraph 17 provides in part that "any drawings furnished by [Interlake] have been carefully examined and are clearly understood * * * and of the specifications heretofore attached." Interlake, however, did not advise Burns that the subsoil might contain cinders, large chunks of iron and coal, buried railroad ties, abandoned concrete foundations and concrete-like slag. It also knew that there was a break in the existing sewer line between manhole No. 2 and manhole No. 1 and that periodically waste water would fill up and back out of manhole No. 2 at a rate in excess of 1500 gallons per minute. None of the bidders was apprised of these conditions. Despite the knowledge that these conditions might exist, Interlake specifically instructed Burns to bid the project on the assumption that the soil was virgin and provided Burns with soil test borings from an area that was several hundred feet removed from the intended route of

the new sewer line. Interlake did not share with Burns any information that would have indicated the true nature of the subsoil. As the trial court stated, "Interlake certainly had much more information to divulge if they wanted a clean, trouble-free job to have been accomplished." We believe that the mistake in this case occurred despite Burns' exercise of reasonable care.

■■ The fourth element required in rescinding a contract because of mutual mistake is that the other party (Interlake) can be placed in the status quo existing at the time the contract was made. Where, as here, however, a party has received a benefit and restoration of the status quo has been rendered impossible by reason of circumstances not the fault of the party seeking to rescind, restoration or an offer to restore need not be made. (12 Ill. L. & Prac. *Contracts* §349 (1955); *Hakala v. Illinois Dodge City Corp.* (1978), 64 Ill. App. 3d 114, 120, 380 N.E.2d 1177.) Interlake appears to agree that the impossibility of restoring the status quo does not, in and of itself, bar rescission and quantum meruit recovery—"Since Interlake cannot give back either the manhours or the installed materials, Burns must alternatively be given the dollar value of what Interlake received on this project."

■■ Upon our examination of the record we do not believe that the trial court erred in rescinding Burns' contract with Interlake on the grounds of mutual mistake.

## II

In its second argument Interlake maintains that even if the contract was properly rescinded the trial court improperly applied a quantum meruit measure of damages. We agree.

In *Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.* (1980), 87 Ill. App. 3d 480, 486, 408 N.E.2d 1069, the court defined the nature of quantum meruit recovery:

> "In the law, 'quantum meruit' means literally 'as much as he deserves.' (*Nardi & Co. v. Allabastro* (1974), 20 Ill. App. 3d 323, 314 N.E.2d 367.) It is an expression that describes the extent of liability on a contract implied by law, and is predicated on the reasonable value of services performed. (*Nardi.*) The basis for recovery under this theory is receipt by a defendant from a plaintiff of a benefit which is unjust for him to retain without paying for it. *Arthur Rubloff & Co. v. Drovers National Bank* (1980), 80 Ill. App. 3d 867, 400 N.E.2d 614."

■■ The trial court awarded Burns $130,406.25, which included all of Burns' costs on its itemized statement except overhead and handling charges, less what Interlake had already paid. This figure, however, did not take into account what amount of Burns' costs were attributable to

Burns' own construction errors. The trial court apparently concluded that some of these costs were occasioned by Burns' own negligence. The trial judge stated, "Certainly I am satisfied that Burns did some things in the completion of this job which complicated the water, soil condition." Despite this conclusion the court did not determine how much of Burns' costs, as reflected in its statement, was caused by its own negligence in failing to seal the Valley Mould and Iron line and in piercing an existing sewer line with one of its well points. The court merely deleted Burns' handling and overhead charges and declined to add prejudgment interest.

We believe that the award of damages must be vacated and the cause remanded for a hearing to ascertain the value of Burns' work. The value of that work should not include the costs, if any, necessitated by Burns' own negligent acts or omissions.

For the foregoing reasons we affirm the trial court's judgment rescinding the parties' contract on the ground of mutual mistake, vacate the award of damages and remand the cause for a hearing on damages not inconsistent with the views expressed herein.

Affirmed in part, vacated in part and remanded with directions.

STAMOS, P. J., and HARTMAN, J., concur.