819 F.2d 831
 4 UCC Rep.Serv.2d 1442
 UNITED STATES of America and Berton J. Roth, As Substitute
Trustee Under the Mortgage Dated January 15, 1982,
with Great Plains Gasification
Associates, Appellees,
State of North Dakota, ex rel, Nicholas J. Spaeth, Attorney
General of North Dakota, Intervenors/Appellees,
v.
GREAT PLAINS GASIFICATION ASSOCIATES, ANR Gasification
Properties Company, As a Partner of Great Plains
Gasification Associates, MCN Coal Gasification Company, as a
Partner of Great Plains Gasification Associates, Tenneco SNG
Inc., As a Partner of Great Plains Gasification Associates,
Pacific Synthetic Fuel Company, As a Partner of Great Plains
Gasification Associates, Natural Gas Pipeline Company of
America, ANR Pipeline Company, formerly Michigan Wisconsin
Pipe Line Company, Tennessee Gas Pipeline Company, and
Transcontinental Gas Pipe Line Corporation, Appellants.
NATURAL GAS PIPELINE CO. OF AMERICA,
v.
FEDERAL FINANCING BANK.
 Nos. 86-5225, 86-5240.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 14, 1987.
Decided May 19, 1987.
Rehearing Denied July 14, 1987.
Rehearing and Rehearing En Banc Denied July 28, 1987.
 
 Robert A. Helman, Chicago, Ill., for appellants.
 Dean S. Cooper, Dept. of Justice, Washington, D.C., for appellees.
 Nicholas Spaeth, Atty. Gen., Bismarck, N.D., for intervenor/appellee State of N.D.
 Before ROSS, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and CAHILL,* District Judge.
 ROSS, Circuit Judge.
 
 
 1
 This appeal is related to a recent decision by this court in United States v. Great Plains Gasification Associates, 813 F.2d 193 (8th Cir.1987). Both appeals arose out of the financing, construction and operation of the Great Plains Coal Gasification Plant in North Dakota, a facility which converts lignite coal into synthetic gas (the project). In this appeal we affirm the district court's[1] order granting summary judgment in favor of the United States which had sued to enforce certain Gas Purchase Agreements on which the future of the project depends.
 
 
 2
 Great Plains Gasification Associates (Great Plains), a North Dakota partnership formed by four subsidiaries of major energy companies, and an additional investor, built and operated the plant and served as seller of the gas produced by the project. ANR Gasification Properties Company (ANR), MCN Coal Gasification Company (MCN), Tenneco SNG Inc. (Tenneco), Transco Coal Gas Company (Transco) and Pacific Synthetic Fuel Company were the Great Plains partners. The first four of these partners are affiliated with pipeline companies which undertook to buy all of the gas produced by the project. The pipeline companies which entered into Gas Purchase Agreements with Great Plains for this purpose were ANR Pipeline Company (affiliate of ANR), Natural Gas Pipeline Company of America (affiliate of MCN), Tennessee Gas Pipeline Company (affiliate of Tenneco) and Transcontinental Gas Pipe Line Corporation (affiliate of Transco). ANG Coal Gasification Company (ANG), an affiliate of ANR and ANR Pipeline Company, served as project administrator.
 
 
 3
 Great Plains financed construction of the project through $536 million in equity contributions by its partners and a $1.5 billion loan from the Federal Financing Bank (FFB). The United States Department of Energy (DOE) guaranteed the FFB loan pursuant to the Federal Nonnuclear Energy Research and Development Act of 1974, 42 U.S.C. Secs. 5901-5920 (1982 and Supp.1985).
 
 
 4
 The Gas Purchase Agreements, all dated January 2, 1982 and virtually identical in content, obligated each of the four pipelines to "take or pay" for a fixed share of the gas produced by the project. Similarly, Great Plains was required to sell all of the gas produced by the facility to the four pipeline companies. The Loan Guarantee Agreement by which the United States through DOE undertook to guarantee the FFB loan expressly conditioned issuance of the guarantee on execution of the Gas Purchase Agreements, among other conditions.[2]
 
 
 5
 Article XIX of the Gas Purchase Agreements entitled Great Plains to "abandon its services" as seller at any time it determined "in its sole good faith judgment, that it [was] not feasible to continue such service" for certain enumerated reasons "or any other reason."
 
 
 6
 Section 5.03 of the Partners Consent and Agreement between the Great Plains partners and the United States entitled the Great Plains partners to terminate their participation in the project. The only liability to the terminating partners in this event was the loss of equity contributions previously made.
 
 
 7
 The four pipeline companies and the United States through DOE entered into a Pipeline Affiliates Agreement, dated January 29, 1982. Section 2.02 of this agreement provided that if Great Plains defaulted under the Gas Purchase Agreements, DOE could notify the pipelines that the United States was electing to take over the project and assume Great Plains' obligations. Such notice would suffice to reinstate the Gas Purchase Agreements between the pipelines and the Secretary of DOE or his designee.
 
 
 8
 By July 1985, the project, although producing synthetic gas, was in financial difficulties primarily because of decreasing market prices for energy. On July 30, 1985, DOE rejected a proposal by the Great Plains partners to restructure the project debt with financial assistance from the United States Synthetic Fuels Corporation.
 
 
 9
 On August 1, 1985 Great Plains defaulted on its loan payment to the FFB. The Great Plains partners invoked section 5.03 of the Partners Consent and Agreement and terminated their participation in the project. The United States then stepped in, paid the FFB and directed the project administrator, ANG, to continue operations until further notice.
 
 
 10
 On August 19, 1985, appellant Natural Gas Pipeline Company of America (Natural) sued the United States in two courts, taking the position that the Great Plains partners' termination of their participation in the project had rendered the Gas Purchase Agreement between Great Plains and Natural void and ineffective from and after August 1, 1985. In addition, Natural argued, as it does in this appeal, that certain press releases by DOE personnel during the two weeks after DOE took over the project reflected a policy decision to abandon the project prior to completion of a twenty-five year period which Natural asserts was the contract term under the Gas Purchase Agreements. Natural accordingly sought to return the gas it had taken since July 31, 1985 or, alternatively, to pay the market price for that gas.
 
 
 11
 On August 23, 1985, the United States exercised its right under section 2.02 of the Pipeline Affiliates Agreement to notify the pipelines that the Gas Purchase Agreements were reinstated, effective August 1, 1985, with DOE substituted as seller. On August 29, 1985, the United States filed this lawsuit against the pipelines and others seeking to enforce the Gas Purchase Agreements and to require Natural to pay amounts then overdue for gas taken from the project in July 1985.
 
 
 12
 In a letter dated August 30, 1985, Natural denied that the United States could invoke section 2.02 of the Pipeline Affiliates Agreement to reinstate Great Plains' Gas Purchase Agreement with Natural. The primary basis for Natural's position was that DOE personnel after August 1, 1985 had made statements to the press suggesting less than a long-term commitment to continue operating the project. Accordingly, Natural also demanded assurance of due performance from DOE under ILL.REV.STAT. ch. 26, Sec. 2-609,[3] stating:
 
 
 13
 However, assuming that it would be possible for someone to retract Great Plain's [sic] repudiation of the Gas Purchase Agreement and that the Secretary could credibly assume the obligations of Great Plains under the Gas Purchase Agreement despite his prior statements, Natural would still have reasonable grounds for insecurity with respect to the Secretary's performance. Natural therefore demands, pursuant to Ill.Rev.Stat. ch. 26, Sec. 2-609, adequate assurance that the Secretary will in fact assume each and every obligation of Great Plains under the Gas Purchase Agreement. Specifically, Natural demands adequate assurance that the Secretary intends to operate the Gasification Plant on a long-term basis and that the Secretary will be liable for supplying the required amount of gas to Natural from the Gasification Plant for 25 years.
 
 
 14
 The district court, on the motion of the United States for summary judgment, decided that the Gas Purchase Agreements unambiguously require the pipelines to purchase the project's entire output so long as the gas meets contract specifications and so long as the Federal Energy Regulatory Commission continues to permit the cost to be passed to the pipelines' customers. Moreover, Article XIX of the Gas Purchase Agreements[4] permits the United States, as successor to Great Plains, to cease production for any reason in its good faith judgment. The pipelines' arguments concerning unconscionability, overreaching and ambiguity are negated by the interlocking ownership and control between the pipelines (buyers) and the Great Plains partners (seller and drafters of the documents). Moreover, if the press releases by DOE personnel provided a basis for insecurity, Natural's demand for assurance was nevertheless invalid. Natural sought assurance of more than it was entitled to under its Gas Purchase Agreement, and Natural was itself in breach of the Agreement when it demanded assurance of DOE's future performance.[5] We agree with the district court on each of these points.
 
 
 15
 We note first that from the time the United States took over the project there has been no cessation of production of any kind. DOE has never decided to terminate production, and the DOE statements to the press which Natural cites as grounds for insecurity under section 2-609 were not communications to the parties to the Gas Purchase Agreements or statements of any official policy decision to cease production.
 
 
 16
 The district court correctly interpreted Article XIX of the Gas Purchase Agreements. The only limitation on Great Plains' and therefore DOE's right to abandon its services under the Gas Purchase Agreements is the obligation to act in good faith.[6] As a result, when Natural demanded assurance of an unqualified twenty-five year commitment to produce gas from the plant, Natural sought more than DOE, as successor to Great Plains, was obligated to provide. See Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co., 532 F.2d 572, 581, 582 (7th Cir.1976) (a section 2-609 demand is invalid when the assurance requested seeks more than the party making the demand is entitled to).
 
 
 17
 Furthermore, we agree with the district court that Natural was not entitled to demand assurance from the United States on August 30, 1985, because Natural was by then in breach of the Gas Purchase Agreement, having failed to pay for July 1985 gas. In addition to its withheld payment, Natural had by the date of its demand openly repudiated the Gas Purchase Agreement in the lawsuits filed on August 19, 1985. In those suits Natural declared the Gas Purchase Agreement to which it was a party[7] null and void from and after August 1, 1985 and refused to pay the contract price for gas taken after July 30, 1985.
 
 
 18
 As for other defenses, the pipelines assert that changed economic conditions, caused in part by Federal Energy Regulatory Commission actions, have created the unforeseen event of low energy prices. The pipelines invoke two legal theories based on this premise, frustration of purpose and mutual mistake of fact, both of which can provide grounds for contract rescission in a proper case. However, the parties clearly contemplated the likelihood of changing economic conditions including fluctuation in fuel prices, and such fluctuation was not the kind of completely unforeseeable event required to invoke the doctrine of frustration of purpose. Nor does increased expense qualify as frustration of purpose. As for mutual mistake, see Shear v. National Rifle Ass'n, 606 F.2d 1251, 1260 (D.C.Cir.1979) ("The mistake doctrine does not apply to predictions or promises of future conduct."). See also Tony Downs Foods Co. v. United States, 530 F.2d 367, 373, 209 Ct.Cl. 31 (1976) (mistaken judgment as to economic conditions is not the kind of mistake for which relief from contract obligations is granted). We have reviewed the pipelines' additional arguments and defenses and find them to be without merit. The Gas Purchase Agreements are enforceable. Accordingly, we affirm the judgment of the district court.
 
 
 
 *
 The HONORABLE CLYDE S. CAHILL, United States District Judge for the Eastern District of Missouri, sitting by designation
 
 
 [1]
 The Honorable Patrick A. Conmy, Chief Judge, United States District Court for the District of North Dakota
 
 
 [2]
 The price which the pipelines had agreed to pay in the Gas Purchase Agreements was based on a formula which was to change every five years over a twenty-five year period. In the early years of the project, the price in effect included a subsidy. The gas purchasers (all affiliates of the seller partnership) had agreed to pay higher than market prices as an inducement to the United States to guarantee the FFB loan. In turn, the pipelines conditioned their participation in the project on a favorable ruling from the Federal Energy Regulatory Commission, which they obtained, permitting them to pass on to their own customers the prices paid for the gas
 
 
 [3]
 ILL.REV.STAT. ch. 26, Sec. 2-609 states:
 Sec. 2-609. Right to Adequate Assurance of Performance.
 (1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
 (2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.
 (3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.
 (4) After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.
 
 
 [4]
 Article XIX of the Gas Purchase Agreement between Great Plains and Natural states:
 Seller shall have the right, with the consent of the Secretary so long as the Mortgage is in effect, to abandon its services hereunder at any time following the determination, made by Seller in its sole good faith judgment, that it is not feasible to continue such service for technological reasons, cost overruns in excess of Seller's estimate of costs of construction of the Gasification Plant or related facilities, government action, whether by legislation, regulation, amendment of authorizations or otherwise, law suits, force majeure including all causes or contingencies described in Section 1 of Article IX hereof, or any other reason, whether similar or dissimilar to those enumerated hereinabove.
 
 
 [5]
 The district court also reasoned that the commercial purpose of a demand for assurance under section 2-609 of the Uniform Commercial Code is to permit a party likely to be injured by the other party's nonperformance to take steps to protect itself. In the present case, however, because at the time of the demand the contract price for gas had reached two and one-half times the market price, in fact DOE's nonperformance would have conferred an economic benefit on Natural. The court concluded that Natural's demand for assurance was merely a subterfuge to escape its obligations under the Gas Purchase Agreement. We agree
 
 
 [6]
 We agree with the district court that the Gas Purchase Agreements as a whole and Article XIX specifically are unambiguous. We also reject the pipelines' contention that Article XIX as interpreted by the United States and the district court rendered the Gas Purchase Agreements void for lack of mutuality of consideration. Output contracts are enforceable and are not illusory promises. See generally A. CORBIN, CORBIN ON CONTRACTS Sec. 158 (1952) ("Even though the promisor retains the privilege of closing down the works and of producing and delivering nothing, he has given a sufficient consideration in promising to sell his entire output, whatever it may be, to the promisee and none to others.")
 
 
 [7]
 ANR Pipeline Company does not join in the other pipelines' position that the Gas Purchase Agreements are unenforceable. Tennessee Gas Pipeline Company and Transcontinental Gas Pipe Line Corporation never sent letters requesting assurance from DOE and therefore did not demand adequate assurance of due performance "in writing" as required by section 2-609 of the Uniform Commercial Code. We question the validity of their view that they are entitled to rely on Natural's demand letter, but we need not decide the issue in light of our conclusion that Natural's demand was invalid