869 F.2d 310
 102 P.U.R.4th 579
 UNITED STATES of America, National Rural Utilities
Cooperative Finance Corporation and Soyland Power
Cooperative, Inc., Plaintiffs-Appellees,
v.
SOUTHWESTERN ELECTRIC COOPERATIVE, INC., Defendant-Appellant.
 No. 88-1695.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 28, 1988.
Decided Feb. 8, 1989.
 
 James J. Stamos, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for defendant-appellant.
 R.R. McMahan, Lord, Bissell & Brook, Chicago, Ill., Larry R. Steffes, U.S. Dept. of Justice, Washington, D.C., for plaintiffs-appellees.
 Before CUMMINGS and FLAUM, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.
 CUMMINGS, Circuit Judge.
 
 
 1
 This action was filed by the United States (on behalf of the Rural Electrification Administration (REA)), the National Rural Utilities Cooperative Finance Corporation (CFC), and Soyland Power Cooperative, Inc. (Soyland) against Southwestern Electric Cooperative, Inc. (Southwestern). The plaintiffs sought a declaration that the 1976 contract under which Southwestern promised to purchase all its electric power requirements from Soyland until 2015 is binding and enforceable. Southwestern counterclaimed for a declaration that the contract is void under the doctrines of mutual mistake of fact and frustration of purpose.
 
 
 2
 The plaintiffs filed a motion for summary judgment and Southwestern filed a cross-motion for partial summary judgment. On December 28, 1987, the district court released a memorandum opinion holding that plaintiffs' motion for summary judgment should be granted and that Southwestern's counterclaim should be dismissed and its cross-motion for partial summary judgment should be denied. 676 F.Supp. 897.
 
 
 3
 The REA is a government agency which makes or guarantees loans to implement the rural electrification program encompassed by the Rural Electrification Act (7 U.S.C. Secs. 901-950b). Plaintiff CFC, a not-for-profit District of Columbia association of mostly rural electric cooperatives created to supplement the REA loan programs, has similar interests to REA's. Soyland and Southwestern are members of CFC.
 
 
 4
 Since the passage of the Rural Electrification Act in 1936, the REA has financed approximately 800 distribution cooperatives across the nation. The members of those cooperatives are rural consumers to whom the cooperatives distribute electric power. Southwestern, located in Greenville, Illinois, has been serving as such a cooperative since 1939.
 
 
 5
 Soyland, whose principal office is in Decatur, Illinois, is one of 60 generation and transmission cooperatives also financed by the REA loan program. Generation and transmission cooperatives sell their power wholesale to their member distribution cooperatives, such as Southwestern. Although organized in 1963, Soyland was inactive until 1975.
 
 
 6
 In 1975 Southwestern and fourteen other distribution cooperatives decided to acquire an 8.42% interest[1] in the Clinton Power Station,[2] a nuclear generating plant to be built in DeWitt County, Illinois, by the Illinois Power Company of Sangamon County, Illinois. Soyland was chosen as both the entity through which they would acquire that interest and the generation and transmission cooperative for the fifteen distribution cooperatives' share of the power to be generated by the Clinton plant.
 
 
 7
 The construction of the plant was marred by a series of delays and cost increases. Although commercial production of power from the Clinton plant was scheduled to commence in June 1980, production of power did not commence until November 1987 (Soyland Br. 8-9). Construction cost estimates of the plant rose from an initial projection of $361,195,000 in February 1976 to $666,654,000 in August 1976 and then to $3,250,000,000 in November 1985. The final cost of the power plant upon completion exceeded $5,000,000,000.
 
 
 8
 Southwestern and the other fourteen distribution cooperatives acquiring an ownership interest in the Clinton plant financed their acquisition through loans to Soyland made or guaranteed by REA and CFC. By March 1986, REA had advanced $23,815,000 to Southwestern for construction of its electrical distribution system and CFC had loaned it an additional $5,838,000 for the same purpose. Substantial amounts of these loans remain outstanding (663 F.Supp. 538, 539). REA has also guaranteed the repayment of $480,000,000 in construction loans made to Soyland of which $474,000,000 is still outstanding. Similarly CFC has advanced $63,000,000 to Soyland, and $58,707,606 remains outstanding (Soyland Br. 5).
 
 
 9
 As a condition of making these loans to Soyland, REA and CFC required Southwestern and its fourteen sister distribution cooperatives to execute long-term all-requirements wholesale power contracts with Soyland. Under these contracts, the fifteen cooperatives promised to purchase all their power from Soyland at a rate based on the maintenance and generation of power costs, as well as retirement of the debt incurred in construction of the plant as specified in paragraph 4(b) of the contract (676 F.Supp. at 901-902). As a result of keying the pricing formula to the cost of the plant construction, the cost of electricity supplied by the plant to distribution cooperatives such as Southwestern greatly exceeded the projected rates.
 
 
 10
 All-requirements contracts, such as the Soyland-Southwestern one, secure approximately $40 billion in loans committed by REA to cooperatives throughout the country. As Judge Stiehl found in his first memorandum opinion in this case, this particular long-term all-requirements contract, which REA and CFC required Southwestern and Soyland to negotiate, remains the primary security to ensure the repayment of the extremely large loans which REA and CFC made to Soyland and Southwestern. 663 F.Supp. at 540. He concluded that requiring Southwestern and Soyland to enter into this contract to secure their loans was within the power of the REA administrator under 7 U.S.C. Sec. 904. 663 F.Supp. at 541.
 
 
 11
 The particular all-requirements contract involved in this lawsuit was executed by Southwestern and Soyland on May 26, 1976. According to Southwestern, Soyland started selling power to Southwestern under this contract in 1983. (Southwestern Br. 15.) On March 24, 1986, Southwestern executed a "deferral agreement" with Soyland, postponing until December 31, 1986, Southwestern's obligation to make further payments commencing with the March 1986 billing. Soyland's complaint admits that Southwestern paid Soyland for power under the contract from March 1984 through October 1985, but alleges that Southwestern remains in arrears in its payments under the requirements contract; Southwestern denies this arrearage in its pleadings.
 
 
 12
 In February 1986 Southwestern filed a suit in the Circuit Court of Madison County, Illinois, seeking a judgment that the requirements contract between it and Soyland is void. In that action Southwestern raised similar affirmative defenses and a counterclaim seeking relief similar to the present lawsuit. The state action was later voluntarily dismissed by Southwestern after this action was filed in federal court. Southwestern is the only one of Soyland's fifteen members seeking rescission of its requirements contract with Soyland.
 
 
 13
 Judge Stiehl handed down two memorandum opinions in this case. The first opinion held that the United States (on behalf of the REA) and CFC had standing to join Soyland in bringing this declaratory judgment action against Southwestern. 663 F.Supp. 538. That holding is not questioned on appeal. The second opinion, which is the basis of this appeal, held that the contract between Soyland and Southwestern is valid and enforceable and therefore rejected Southwestern's arguments that the contract was void on the basis of mutual mistake of fact or frustration of purpose. 676 F.Supp. 897. We affirm.
 
 Introduction to Decision
 
 14
 In Fuchs v. Rural Electric Convenience Cooperative, Inc., 858 F.2d 1210 (7th Cir.1988), we recently held that a contract between Rural Electric Convenience Cooperative and Central Illinois Public Service Company dividing service areas pursuant to the Illinois Electric Supplier Act was not invalid under the federal antitrust laws. That panel opinion contains a footnote (pp. 1212-13) which reveals the implications of Southwestern's attempt to void the contract at issue. It provides as follows:
 
 
 15
 8 This dispute is apparently but one variation of the periodic conflicts occurring between co-op customers and their electricity suppliers. When Congress enacted the REA in 1936, ninety percent of rural residents were without electric power. The REA (along with the National Rural Utilities Cooperative Finance Corporation, which provides additional financing to supplement the REA's loan and loan guarantee program) provided the loan capital for the construction of facilities, the extension of lines, and the generation and transmission of power in sparsely populated areas "which the investor-owned utilities had not found it profitable to service." Salt River Project Agr. Imp. and Power Dist. v. Federal Power Commission, 391 F.2d 470, 473 (D.C.Cir.1968). Total cumulative government financing of rural electrification approaches $50 billion. The co-ops pay for these loans through their member/consumers' electric rates. Now that the rural electric systems are almost universally in place, but not paid for, some co-op customers are disgruntled with their rates, which necessarily reflect the amortization cost of the system.
 
 
 16
 Consequently, distribution co-ops have tried to sell their assets to neighboring investor-owned utilities, Tri-State Generation and Transmission Assoc., Inc. v. Shoshone River Power, Inc., 805 F.2d 351 (10th Cir.1986), or to void their long-term contracts with co-op suppliers whose rates are higher than neighboring utilities. United States v. Southwestern Electric Coop., 663 F.Supp. 538 (S.D.Ill.1987). The withdrawal of any distribution co-op from the system necessarily shifts the fixed costs of the electricity (represented by the debt service) to the other members of its generation and transmission cooperative and raises the possibility of default, with potentially disastrous results for the system. See Tri-State, 805 F.2d at 357. It is clear that somebody will have to retire the debt of the rural electrification system; if co-op customers like plaintiffs succeed in removing themselves from the REA structure in large enough numbers to precipitate default, the costs may eventually be shifted to federal taxpayers.
 
 Mutual Mistake
 
 17
 Southwestern's principal argument for avoiding the May 1976 requirements contract with Soyland is based on the doctrine of mutual mistake.[3] The elements of the doctrine of mutual mistake were set forth recently in John Burns Construction Co. v. Interlake, Inc., 105 Ill.App.3d 19, 60 Ill.Dec. 888, 433 N.E.2d 1126 (1st Dist.1982). In John Burns, the trial court rescinded the contract there because of mutual mistake (105 Ill.App.3d at 24, 60 Ill.Dec. 888, 433 N.E.2d 1126) and the Appellate Court of Illinois affirmed because it said the requisite four elements for mutual mistake were satisfied. Those elements were stated as: (1) the alleged mistake must relate to a material feature of the contract, (2) unconscionability, (3) exercise of reasonable care by the party seeking rescission and (4) the party opposing rescission can be placed in status quo.[4] 105 Ill.App.3d at 25, 60 Ill.Dec. 888, 433 N.E.2d 1126. After reciting these requirements of Illinois law, the district judge added that Casanas v. Nelson, 140 Ill.App.3d 341, 346, 95 Ill.Dec. 137, 489 N.E.2d 358 (2d Dist.1986), holds that rescission on the basis of mutual mistake will also not be permitted in Illinois unless "clear and positive evidence" exists demonstrating mutual mistake. 676 F.Supp. at 905.
 
 
 18
 The fatal difficulty with Southwestern's argument is that while the parties to that contract may have been mistaken about the future costs of construction of the Clinton power plant, the doctrine of mutual mistake does not cover an erroneous "prediction or judgment as to events to occur in the future." Restatement (Second) of Contracts Sec. 151a. Applying Illinois law, this Court has held in rejecting an asserted mutual mistake claim, "it must be a mistake of a present or a past fact." Rice v. Trunkline Gas Company, 323 F.2d 394, 396 (7th Cir.1963) (applying Illinois law); see also S.T.S. Transport Service v. Volvo White Truck Corp., 766 F.2d 1089, 1093 (7th Cir.1985) (also applying Illinois law); Purvines v. Harrison, 151 Ill. 219, 224, 37 N.E. 705 (1894); Casanas v. Nelson, 140 Ill.App.3d 341, 347, 95 Ill.Dec. 137, 489 N.E.2d 358 (2d Dist.1986); Boyd v. Aetna Life Insurance Co., 310 Ill.App. 547, 555, 35 N.E.2d 99 (4th Dist.1941). The cost of constructing the power plant when the parties entered into the all-requirements contract at issue was estimated to be $666,654,000, nearly double Illinois Power Company's first published cost estimate in February 1973 of $361,195,000. The 1976 figure of $666,654,000 was clearly nothing more than a projection or estimate of the final cost.
 
 
 19
 Additionally, after signing the requirements contract, Southwestern and the other members of Soyland authorized it to enter into the August 1976 agreement with Illinois Power Company for the construction of the Clinton plant.[5] Paragraph 8.9 of that construction agreement recognized that the estimated cost of that plant was uncertain and subject to change, for it provided:
 
 
 20
 Cost changes. The Participants are aware that the estimated costs of the Clinton Station (including cost of fuel) are subject to change by reason, among other matters, of inflation, compliance with additional governmental requirements, design and equipment changes, and delays in construction and commencement of operation. (IV D.Ct.App.1033.)
 
 
 21
 Therefore, Southwestern's claim that it should not bear the risk of cost changes cannot be sustained. Indeed the rate provision in paragraph 4(b) of the all-requirements contract between Southwestern and Soyland was keyed to Soyland's generating plant costs (676 F.Supp. at 901-902), undermining Southwestern's present position that it is entitled to rescission. Southwestern has not attempted to satisfy requirement (2) or (4). Therefore we need not consider requirement (3) or whether the district judge correctly concluded that requirement (1) had also not been satisfied.
 
 
 22
 Southwestern argues that the standard set forth in the Restatement (Second) of Contracts Sec. 152, should govern rather than the John Burns test which, according to Southwestern, should only apply to unilateral mistake cases. That argument is futile because, as shown supra, the rules governing rescission for either mutual or singular mistake are inapplicable where, as here, a party's erroneous prediction or judgment as to future events is involved. Idem Sec. 151a.
 
 
 23
 In the district court, Southwestern attempted to introduce as evidence of a mutual mistake admissions contained in pleadings filed in an unrelated case commenced by Soyland against the plant construction company in state court.[6] In that case, Soyland alleges that Illinois Power Company's project manager's deficient performance was the cause of the tenfold increase in projected construction costs and that Illinois Power Company misrepresented the cost estimates. Southwestern claims that Soyland should be estopped from denying that a mutual mistake exists between Southwestern and Soyland since Soyland alleges in the state court action that it relied upon these allegedly misrepresented figures in entering into the construction agreement. The district court appropriately rejected Southwestern's argument, since Soyland's suit in state court only demonstrates that the estimate of the construction cost of the plant was mistakenly projected by all parties concerned. This does not change the fact that the mistake in this case involved an error in judgment rather than any error in fact.[7]
 
 Frustration of Purpose
 
 24
 Southwestern also asserted in the district court that the contract is voidable under the doctrine of frustration of purpose. In this Court, the argument is pressed much less vigorously, probably because Judge Stiehl recognized that under Illinois law the defense is not to be applied liberally and the party seeking rescission must show that (1) the frustrating event was not reasonably foreseeable and (2) the value of counterperformance has been totally or nearly totally destroyed by the frustrating event, following Northern Illinois Gas Co. v. Energy Co-Op, Inc., 122 Ill.App.3d 940, 952, 78 Ill.Dec. 215, 461 N.E.2d 1049 (3d Dist.1984). Southwestern has been unable to cite any contrary Illinois or federal case. Indeed, in Northern Indiana Public Service v. Carbon County Coal, 799 F.2d 265, 278 (1986), this Court rejected the defense of frustration of purpose where, as here, the contract in question allows for escalation of price. As we stated there, "[i]f, as is also the case here, the buyer forecasts the market incorrectly and therefore finds himself locked into a disadvantageous contract, he has only himself to blame and so cannot shift the risk back to the seller by invoking impossibility or related doctrines" such as frustration of purpose. Northern Indiana, 799 F.2d at 278.
 
 
 25
 Similarly, in Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co., 508 F.2d 283 (7th Cir.1974), the Canadian government caused a rise in potash prices which defendant supplier claimed to excuse its nonperformance. However, we held that the fact that the performance became economically burdensome was not sufficient to excuse performance. Other more recent cases denying the frustration of purpose defense in circumstances similar to those here include United States v. Great Plains Gasification Associates, 819 F.2d 831 (8th Cir.1987), and Langham-Hills Petroleum, Inc. v. Southern Fuels Co., 813 F.2d 1327 (4th Cir.1987).
 
 
 26
 The only argument Southwestern presents in opposition to these authorities is that this defense should have been considered by a jury rather than denied by the district judge. However, in all the foregoing cases, the defense was rejected by the trial judge and not presented to a jury. Perhaps this is why Southwestern's reply brief does not even touch upon the frustration of purpose defense.[8]
 
 
 27
 The decision of the district court is affirmed.
 
 
 
 [1]
 This is the percentage interest stated in Southwestern's brief (at p. 9) and may not represent the current interest. In Soyland's state litigation with Illinois Power, the 1977 interest is stated as 10.5% (Southwestern App. J at 3)
 
 
 [2]
 In August 1976, Soyland and Western Illinois Power Cooperative, Inc., contracted with Illinois Power Company to have it build the plant
 
 
 [3]
 Both parties have conceded that Illinois law controls construction of the contracts in question since they were made in Illinois and do not provide otherwise
 
 
 [4]
 Southwestern argues that these are really the standards for a unilateral mistake. We need not decide the point, but do note that the authorities cited in John Burns are unilateral mistake cases. Santucci Construction Co. v. County of Cook, 21 Ill.App.3d 527, 531, 315 N.E.2d 565 (1974); People ex rel. Dept. of Public Works v. South East National Bank of Chicago, 131 Ill.App.2d 238, 241, 266 N.E.2d 778 (1971)
 
 
 [5]
 See p. 2 of Soyland's May 28, 1976, Board minutes (reproduced between pages 776 and 777 of volume IV D.Ct.App.). Western Illinois Power Cooperative, Inc., joined in the contract. See note 2 supra
 
 
 [6]
 Soyland Power and Western Illinois Power v. Illinois Power, 86-L-373, was filed in state court in Sangamon County, Illinois
 
 
 [7]
 Aluminum Company of America v. Essex Group, Inc., 499 F.Supp. 53 (W.D.Pa.1980) ("Alcoa"), on which Southwestern principally relies, is inapposite because it was purportedly controlled by Indiana law (at pp. 59-60). Moreover, the case has "faded into obscurity." Halpern, Application of the Doctrine of Commercial Impracticability: Searching for the "Wisdom of Solomon," 135 U.Pa.L.Rev. 1123, 1127 (1987). Finally, Alcoa does not apply where, as here, both parties entered into the requirements contract with conscious ignorance of the eventual higher construction cost of the Clinton plant and where that factor did not enrich Soyland. Matter of Westinghouse Elec. Corp., etc., 517 F.Supp. 440, 459 (E.D.Va.1981)
 
 
 [8]
 In view of our decision that Southwestern was not excused from performance on the ground of mutual mistake or frustration of purpose, there is no need to consider Southwestern's additional arguments that rescission would be inequitable or barred by estoppel