**UNITED STATES of America, National Rural Utilities Cooperative Finance Corporation and Soyland Power Cooperative, Inc., Plaintiffs,**

v.

**SOUTHWESTERN ELECTRIC COOPERATIVE, INC.,**
**Defendant/Counter-plaintiff,**

v.

**SOYLAND POWER COOPERATIVE, INC., Counter-defendant.**

**Cause No. 86–3419.**

United States District Court,
S.D. Illinois.

June 12, 1987.

Diane M. Ennist, Civ. Div. Dept. of Justice, Washington, D.C., for U.S.

Adlai S. Hardin, Jr., Milbank, Tweek, Hadley & McCloy, New York City, for National Rural Utilities Coop. Finance Corp.

Stephen M. Murry, Lord, Bissell and Brook, Chicago, Ill., for Soyland Power Coop., Inc.

James J. Stamos, James Cari, Jr., Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for Southwestern Electrical Coop., Inc.

## MEMORANDUM AND ORDER

STIEHL, District Judge:

Before the Court is Southwestern Electric Cooperative, Inc.'s (Southwestern) Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6).

This cause was filed by the United States of America on behalf of the Rural Electrification Administration (REA), the National Rural Utilities Cooperative Finance Corporation (CFC), and Soyland Power Cooperative, Inc. (Soyland), as a declaratory judgment action seeking to have the Wholesale Power Contract between Soyland and Southwestern declared binding. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1337 and 1345.

The declaratory judgment suit was filed in this Court after the filing of a state court action by Southwestern against Soyland alone seeking a declaration that the Wholesale Power Contract between Soy-

land and Southwestern, entered into on May 26, 1976, was void under the doctrines of mutual mistake of fact and frustration of purpose. The state court action was voluntarily dismissed by Southwestern in response to the filing of the declaratory judgment action by the United States, et al., in this Court. The parties agree that Count II of the complaint for injunctive relief is now moot. Accordingly, the Motion to Dismiss Count II of the complaint is GRANTED.

To sustain dismissal of a complaint under Fed.R.Civ.P. 12(b)(6), the Court must take all well-pleaded allegations as true and construe the complaint in the light most favorable to the plaintiffs to determine whether they are entitled to relief. *Conley v. Gibson,* 355 U.S. 41, 45–56, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1975). "The issue is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support his claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

## I—FACTS

Southwestern is an Illinois not-for-profit corporation formed in 1939 to distribute electrical power to its members in the rural service area. Soyland is an Illinois not-for-profit corporation which serves as a regional generation and transmission cooperative (G & T) engaged in the wholesale production and supply of electricity to its members. Soyland's members consist of fifteen (15) rural Illinois power cooperatives. The REA is a United States Government lending agency which, pursuant to the Rural Electrification Act of 1936 (Act), 7 U.S.C. § 901 et seq., makes or guarantees loans to rural electrical facilities. CFC is a private, not-for-profit cooperative association which serves as a source of financing for its members to supplement REA loans. CFC's membership consists primarily of rural electrification cooperatives. Southwestern is a member of both Soyland and CFC.

Due to the nature of the rural electrification system, numerous contracts and loan agreements have been entered into among the four parties. REA and Southwestern,

pursuant to the Act, entered into a loan agreement for the financing of the rural electrification distribution system. The original loan has been amended numerous times. As of March, 1986, REA had loaned $23,815,000 to Southwestern for the construction of its electrical distribution system. Of that amount, $17,024,097 is outstanding. CFC is also a substantial creditor of Southwestern. As of March, 1986, CFC had loaned $5,838,000 to Southwestern for construction of its electrical distribution system, of which $5,694,959 remains outstanding. To secure these loans, REA and CFC entered into a Supplemental Mortgage and Security Agreement with Southwestern, dated September 13, 1972.

REA and CFC are also substantial creditors of Soyland, of which Southwestern is a member. REA has guaranteed the repayment of loans to Soyland for construction of an electrical generation and transmission system in the amount of $425,580,000 and an additional, unadvanced, amount of $56,802,000 as of March 1986. As of the same date, $425,497,423 remains outstanding. CFC has advanced $63,000,000 to Soyland, of which $58,707,606 was outstanding as of March, 1987. REA and CFC both have mortgages with Soyland to secure the guaranteed loans.

In the mid-1970's, Soyland engaged in a series of negotiations to purchase an ownership interest in the Clinton, Dewitt County, Illinois nuclear power facility which the Illinois Power Company proposed to build.

Southwestern entered into a contract with Soyland on May 26, 1976. This contract is the heart of the litigation before this Court. Pursuant to the contract, Southwestern agreed to purchase all of its electricity requirements from Soyland for a term extending at least until the year 2015 (all-requirements contract).

As stated above, it is this contract which is the subject of the dispute. The plaintiffs have filed for declaratory judgment that the contract is valid and enforceable. The defendant has moved for dismissal and filed a counterclaim against Soyland.

## II—THE
## ALL–REQUIREMENTS CONTRACT

The first determination by this Court must be whether the REA and CFC have standing to bring this action, with Soyland, against Southwestern. REA and CFC assert that they have a joint interest in the all-requirements contract between Southwestern and Soyland as mortgagees of both Southwestern and Soyland. They assert that the contract serves as the "primary security" for REA's and CFC's loans to both. That is, as a condition of their loans, Southwestern and Soyland were obligated to enter into this federally-approved, power supply contract.

In 1936, Congress, pursuant to the Rural Electrification Act, 7 U.S.C. §§ 901–950b, established the Rural Electrification Administration (REA) to make loans available to rural communities to facilitate their obtaining electrical power. *Tri-State Generation v. Shoshone River Power, Inc.*, 805 F.2d 351, 352 (10th Cir.1986).

REA and CFC provide virtually all the financing for the generation and transmission facilities for wholesale cooperatives and distribution cooperatives nationwide. Congress authorized the REA to make loans to carry out the purpose of the Rural Electrification Act, but required the REA to first ensure that "the security therefor is reasonably adequate." 7 U.S.C. § 904; *Tri-State*, 805 F.2d at 353. The all-requirements contract serves as the security required by Section 904 of the Act. This requirement has been recognized as well within the powers of the Administrator of the Act. *Tri-State*, 805 F.2d at 353.

The need for the all requirements contract has been explained as follows:

It has been the practice for many years of REA Administrators, including the affiant, to require as a condition of making operating and transmission loans pursuant to section 4 [of the Act] to cooperatives ... that the borrower shall obtain 35 year contracts with its members (hereinafter called "thirty-five year all-requirements contracts") obligating them to purchase all of their electrical requirements to the extent that the borrower shall have the power and energy available. *The purpose of this requirement is to assure that the borrower will have a market for the power generated and transmitted by the R.E.A. financed facilities and thus be able to repay the loan.*

*Alabama Power Co. v. Alabama Electric Cooperative, Inc.*, 394 F.2d 672, 675 (5th Cir.1968), (quoting affidavit of REA Administrator) (emphasis added), *cert. denied*, 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968). Similarly:

The all-requirements provisions of the wholesale power sales contracts not only ensure that the cooperatives will have an adequate market for their power among their local utility members during the period of the loan but also assure the REA that the utilities making up the federated cooperative seriously desire the loan to be made and intend to use its share of the power capacity which the loan would create. *This customary and long established practice of the REA has been made known to, and acquiesced in, by Congress.*

*Greensboro Lumber Co. v. Georgia Power Co.*, 643 F.Supp. 1345, 1364 (N.D.Ga.1986) (emphasis added). See also, *Public Utility District No. 1 of Franklin County v. Big Bend Electric Coop. Inc.*, 618 F.2d 601, 603 (9th Cir.1980) (in which the court recognized the wide latitude given to the REA to "determine the appropriate course of conduct to accomplish the legislative purpose."); *Upper Missouri G & T Electric Coop. Inc. v. McCone Electric Coop. Inc.*, 160 Mont. 498, 503 P.2d 1001 (Mont.S.C. 1972) (in which the validity of an all-requirements contract was upheld and found not to be against public policy).

This Court is persuaded that the long term all-requirements contract which the REA and CFC required Southwestern and Soyland to enter into served as the primary security to ensure the repayment of the massive loans which the REA and CFC made to Soyland as well as to Southwestern. The defendant makes no attempt to assert that this contract is against public policy, and the Court finds that it is not.

Moreover, requiring Southwestern and Soyland to enter into the contract, as a method of securing their loans, was well within the power of the Administrator of the REA. 7 U.S.C. § 904.

## III—STANDING TO SUE

The Supreme Court in *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) addressed the requirements of standing under Article III. The Court stated that "in essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Id.* at 3325 (quoting *Worth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)).

*Allen* discussed the various elements of the complaint which are to be considered in determining the existence of standing:

> A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief (citations omitted).... The injury must be, for example, "distinct and palpable," ... and not "abstract" or "conjectural" or "hypothetical".... The injury must be "fairly" traceable to the challenged action, and relief from the injury must be "likely" to follow from a favorable decision.

*Id.* (citations omitted). The *Allen* Court cautions that "the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claim asserted." *Id.* Further, "the standing inquiry must be answered by reference to the Art. III notion that federal courts may exercise power only 'in the last resort, and as a necessity ...' [and only when] the dispute is one 'traditionally thought to be capable of resolution through the judicial process.'" *Id.* (citations omitted).

Under the provisions of 28 U.S.C. § 2201, a remedy is created in cases of actual controversy allowing the court to declare the rights and other legal relations of any interested party seeking such declaration, whether further relief is available or requested. *Id.* In the action filed by the REA, CFC and Soyland, the plaintiffs seek declaration by this Court that the contract between Soyland and Southwestern is valid, that repudiation of the contract would result in a breach of the mortgage between the REA and Southwestern, and between CFC and Southwestern which are related to the procurement of loans to Southwestern under the Act, and that the repudiation of the contract would violate 7 U.S.C. § 907, together with further relief. The plaintiffs seek declaratory judgment, costs and attorneys fees.

The standard for declaratory judgment actions "is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Co*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). It is clear, from the facts as alleged, that an actual controversy exists. Southwestern has made an attempt, first by filing a state court action, and now by filing a counterclaim, to invalidate the wholesale power contract it has with Soyland. The plaintiffs seek to prevent this repudiation. The controversy is not remote, the issues are ripe for litigation, and a cause of action has been stated. Clearly, the controversy here is *not* an abstract one. The plaintiffs have a direct interest in the controversy, and, as discussed below, are proper parties to this litigation. See *Diamond Shamrock Corp. v. Lumbermans Mutual Cas. Co.*, 416 F.2d 707, 709 (7th Cir.1969).

The REA and CFC have asserted, in the complaint, that Article II, Section 10(e) of the Mortgage provides that Southwestern will not "without the approval in writing of the holders of notes representing more than 50% of the unpaid principal amount of the notes, enter into *or amend any contract or contracts for the purchase of electric power.*" REA alleges that it holds more than 50% of Southwestern's unpaid amount. (Plaintiff's Complaint, para. 16), (emphasis added). Moreover, CFC asserts

that the mortgage grants it (together with the REA) *an interest in, and present assignment of* ... "[a]ll right, title, and interest of the Mortgagor [Southwestern] in, to and under *any and all contracts* heretofore or hereafter executed by and between the Mortgagor and any person, firm or corporation providing for the purchase ... of electric power or energy by the Mortgagor...." (para. 15). (emphasis added). On the face of the pleadings, REA and CFC have clearly asserted an interest in the repudiation of the contract at issue. This interest is buttressed by the "distinct and palpable" injury which the REA and CFC have alleged will result if Southwestern is allowed to repudiate the contract. *Allen,* 104 S.Ct. at 3325.

Paragraph 33 of the complaint provides that "Southwestern's effort to repudiate the contract will imperil Soyland's financial stability and its ability to repay its loans, *and will impair the economic value of the contract in which REA and CFC have a security interest.*" (Emphasis added.) Further, at paragraph 34 the REA asserts that Southwestern's actions will "jeopardize the REA power supply program both in Illinois and nationwide." Therefore, the REA and CFC have asserted that they will be injured if Southwestern is allowed to avoid the contract because that avoidance will imperil the ability of Soyland to repay its loans to REA and CFC.

Article 4(b) of the contract between Southwestern and Soyland concerns the rate of power supply costs. In that section, the contract specifically acknowledges that the contract is to provide for the electrical power and energy rate "so that it [the rate] shall produce revenues which shall be sufficient, but only sufficient, with the revenues of the Seller [Soyland] from all other sources, to meet the cost of operation and maintenance ... *to make payments on account of principle of, and interest on, all indebtedness of the Seller* and to provide for the establishment and maintenance of reasonable reserves." (Emphasis added.)

Therefore, by the plain language of the contract, the REA and CFC, holding the major percentage of the indebtedness of Soyland, have a strong monetary interest in the validity of the contract as it provides the security for payments on the loans to *Soyland.* The injury which is asserted by the REA and CFC is quite clearly interlinked with Southwestern's attempt to repudiate the contract. The interest of the REA and CFC in this dispute is so strong that the interests of justice demand that they be made a part of the litigation concerning this contract. The injury which is asserted by the REA and CFC is most likely to be redressed by the declaratory relief sought. A decision in favor of the plaintiffs would clearly prevent the injuries from occurring. *Allen,* 104 S.Ct. at 3325.

The REA's regulation and supervision powers over rural cooperatives have been recognized as "far more comprehensive than those which the Federal Power Commission exercises over investor-owned utilities...." *Salt River Project Agr. Dist. v. Federal Power Commission,* 391 F.2d 470, 473 (D.C.Cir.1968), *cert. denied,* 393 U.S. 857, 89 S.Ct. 104, 21 L.Ed.2d 126 (1968). This is particularly true in the area of rate-making. "[I]t is in these areas [rate-making] that, by their structural nature, the cooperatives are effectively self-regulating. They are completely owned and controlled by their consumer-members, and only consumers can become members." *Id.* *Salt River* recognized the emphasis of Congress, in establishing the REA, was to provide the Administrator with "almost unlimited discretion" and "extraordinary power" thereby allowing him to effectively oversee the rural electrification program. *Id.* at 476, *quoting* 80 Cong. Rec. (Part 3) 3308, 3318 (1936).

Recognizing this intent of Congress further supports the finding that the REA has standing under the contract. By virtue of this broad grant of power, together with the requirement of 7 U.S.C. § 904 that adequate security be provided for the rural electrification loans, this Court finds that the intent of Congress and the objective of the Act would be frustrated if standing were denied. This interest of the REA and CFC, contrary to defendant's characterization, is *not* an attempt by the govern-

ment to misuse its position as a creditor to have this Court declare the contract to be valid.

Illinois courts, when addressing contractual relationships, have recognized that certain third parties are entitled to sue on a contract as a third-party beneficiary to the contract. "Whether a party is a third party beneficiary depends upon intent of the parties and must be determined on a case-by-case basis." *Midwest Concrete Products Co. v. LaSalle Nat'l Bank*, 94 Ill. App.3d 394, 49 Ill.Dec. 968, 970, 418 N.E.2d 988, 990 (1981), *leave to appeal denied*, (*citing Vinylast Corp. v. Gordon*, 10 Ill. App.3d 1043, 295 N.E.2d 523 (1973)). The *Midwest* court recognized:

> [I]t is not sufficient that the performance of the [contract] may benefit a third person, ... it must have been entered into for his benefit, or at least such benefit must be the direct result of performance and so within the contemplation of the parties.

*Id.*, *quoting* 17 Am.Jr.2d *Contracts* § 304, at 729–30 (1964). A consideration of this entire contract, and the circumstances surrounding the drafting of it, reveals that the parties intended that the REA and CFC would directly benefit from the contract. The contract was a requirement of the loans by the REA and CFC, it serves as the security for the loan, and the plain language establishes that its purpose is to benefit the REA and CFC as principal holders of Soyland's indebtedness by assuring that payment can be made on the loans. The REA and CFC, therefore, benefit as a direct result of the performance of the contract. As such, their interest in the contract was clearly within the contemplation of the parties, and Southwestern cannot now challenge their standing under, or interest in, the contract. *Accord, I.P.C. Distributors v. Chicago Moving Picture Mach. Op. Union*, 132 F.Supp. 294 (N.D.Ill. 1955).

Furthermore, this Court finds that public policy demands that the REA and CFC have standing to sue. The nature and function of the REA would be severely jeopardized if it were not allowed a voice in the dispute over the validity of this contract. The structure of approximately 60 generation and transmission cooperatives nationwide, and their approximately 800 distribution member cooperatives, for whom the REA and CFC provide financing, is based on a contract very similar to the one in dispute here. Nationwide, this all-requirements contract has been utilized by the Administrator to serve as the primary source of collateral for loans and loan guarantees of the REA. This type of contract assures that the long-term financing costs of providing power to beneficiaries of the Act, such as Southwestern, are equitably distributed. This all-requirements contract is a basic and important element of the rural electrification system.

The Seventh Circuit has recognized that the "doctrine of standing is a complex web, and all the parts of it must be satisfied; but attention to the details of the doctrine does not require us to give up our common sense. '[T]he constitutional standing requirement [cannot be made] a mechanical exercise.'" *Palmer v. City of Chicago*, 755 F.2d 560, 580 (7th Cir.1985) *quoting Allen v. Wright*, 104 S.Ct. at 3325.

In light of the foregoing, the defendant's arguments in support of its Motion to Dismiss must fail. The Court has recognized that the plaintiffs all have standing to sue and that this controversy is properly litigated as a declaratory judgment. Moreover, the Court finds that the REA and CFC are not attempting, in the declaratory judgment action, to inappropriately exert pressure as creditors of Southwestern for the benefit of Soyland. Rather, as creditors of both, the REA and CFC have an interest in determining the validity of the contract.

Accordingly, the Court finds that the REA and CFC have standing to bring this declaratory judgment action, together with Soyland, and that a cause of action has been stated sufficient to allow this Court to determine the validity of the contract.

Therefore, the Court DENIES Southwestern's Motion to Dismiss.

Also pending before the Court is plaintiffs' Motion to Dismiss the counterclaim. At oral argument, the defendant moved for

leave to amend the counterclaim to include the REA and CFC.

Initially, the Court notes that pursuant to Fed.R.Civ.P. 8(c), the defendant's counterclaim is more properly taken as an affirmative defense. While the Court generally construes these claims as an affirmative defense under the Rule, the defendant's request to amend provides it with an opportunity to correctly designate its pleadings, as well as to properly include all necessary parties. Defendant's oral motion for leave to amend is GRANTED. Plaintiffs' Motion to Dismiss the counterclaim is accordingly DENIED as being moot. Defendant is given leave to file its amended responsive pleading within thirty (30) days of the date of this Order.

IT IS SO ORDERED.