858 F.2d 1210
 57 USLW 2210, 1988-2 Trade Cases 68,247
 Eldon FUCHS, et al., On their behalf and on behalf of all
persons similarly situated, Plaintiffs-Appellants,
v.
RURAL ELECTRIC CONVENIENCE COOPERATIVE INC., Central
Illinois Public Service Company and Mary E. Bushnell,
Chairman of the Illinois Commerce Commission, an agency of
the State of Illinois, Defendants-Appellees.
 No. 87-2849.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 20, 1988.
Decided Sept. 20, 1988.
Rehearing and Rehearing En Banc Denied Nov. 17, 1988.
 
 Thomas W. Kelty, Pfeifer & Kelty P.C., Springfield, Ill., for plaintiffs-appellants.
 Lee A. Freeman Sr., Freeman Freeman & Salzman, Chicago, Ill., Thomas R. Jackson, Jones Day Reavis & Pogue, Dallas, Tex., for defendants-appellees.
 Before BAUER, Chief Judge, COFFEY and FLAUM, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 Rural Electric Convenience Cooperative ("RECC") signed an agreement with Central Illinois Public Service Company ("CIPS") dividing service areas pursuant to the Illinois Electric Supplier Act. Plaintiff customers, who are member-owners of RECC, contend that defendants violated the antitrust laws by engaging in horizontal market division and monopolization. The district court granted defendants' motions for summary judgment and to dismiss on the ground that defendants' activities constituted state action exempting[1] them from liability under the antitrust laws. 672 F.Supp. 1111. We affirm.
 
 I.
 
 2
 RECC is an unregulated, not-for-profit Illinois corporation, owned by nearly 5,000 consumer-members and governed by an elected board of directors. It is an "electric cooperative" as defined in Sec. 3-119 of the Illinois Public Utilities Act ("PUA"), Ill.Rev.Stat. ch. 111 2/3, para. 3-119, and Sec. 3.4(b) of the Illinois Electric Supplier Act ("ESA"), Ill.Rev.Stat. ch. 111 2/3, para. 403.4(b). RECC is one of seven local power distribution cooperatives which are members of Western Illinois Power Cooperative ("WIPCO"), a generation and transmission cooperative that provides wholesale power to its members.[2] RECC was formed in 1936 with a loan from the Rural Electrification Administration ("REA") pursuant to the Rural Electrification Act, 7 U.S.C. Secs. 901-916. Congress authorized the REA to provide low interest, federally-insured loans and loan guarantees, preferably to cooperatives and government entities,[3] to facilitate the electrification of rural America. See generally City of Mount Pleasant v. Associated Elec. Coop., Inc., 838 F.2d 268, 271-72 (8th Cir.1988); Salt River Project Agr. Dist. v. Federal Power Comm., 391 F.2d 470, 473 (D.C.Cir.), cert. denied, 393 U.S. 857, 89 S.Ct. 104, 21 L.Ed.2d 126 (1968). RECC is not a public utility under Illinois law. PUA Sec. 3-105.c.2.
 
 
 3
 CIPS is a regulated, investor-owned public utility under Sec. 3-105 of the PUA. Its retail electric rates are regulated by the Illinois Commerce Commission ("ICC"). PUA Secs. 4-101, 9-101 et seq.[4]
 
 
 4
 In 1965, Illinois passed the ESA, essentially giving legal sanction to the state's natural electric utility monopolies.[5] The legislature stated that the Act furthered the public interest "to avoid duplication of facilities and to minimize disputes between electric suppliers which may result in inconvenience and diminished efficiency in electric service to the public...." ESA Sec. 402. Consequently, the ESA "set forth a comprehensive scheme for determining which of two or more contending suppliers is entitled to serve a given customer or location." Rural Elec. Convenience Coop. v. Illinois Commerce Comm., 75 Ill.2d 142, 387 N.E.2d 670, 672, 25 Ill.Dec. 794, 796 (1979). Under the Act, both public utilities such as CIPS and electric cooperatives such as RECC are defined as "electric suppliers." ESA Sec. 403.5. The Act effectively froze the status quo of Illinois electric service. It forbid the construction of new lines or the extension of service to customers and areas served by other suppliers except by written consent of the other supplier, subject to the approval of the Illinois Commerce Commission (ICC). ESA Secs. 405, 407. To facilitate this scheme, the Act provides that "[a]ny 2 or more electric suppliers may contract together [subject to ICC approval] defining and delineating, as between themselves, one or more service areas in which each such contracting supplier shall be entitled to furnish service." ESA Sec. 406.
 
 
 5
 CIPS and RECC entered into such an agreement on February 19, 1969. The ICC issued its approval on April 29, 1969, finding that the agreement was in the public interest and complied with the ESA. Plaintiffs claim, and the district court found, that this service area agreement is a horizontal market allocation constituting a per se violation of the antitrust laws.[6] They contend that but for this agreement, they could buy electricity from CIPS at lower rates than they now pay to RECC.[7] Defendants assert that the federal antitrust laws do not apply to them under the state action doctrine.[8]
 
 
 6
 The district court agreed that the state action doctrine precluded plaintiffs' suit against defendants and granted RECC's and Bushnell's motions for summary judgment and CIPS' motion to dismiss. The issue on appeal is whether the court applied the proper test to determine whether defendants' activities are exempt from the antitrust laws.[9] The court held that the ESA articulated a clear and affirmatively expressed policy to displace competition, see California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980); LaSalle Nat'l Bank of Chicago v. DuPage County, 777 F.2d 377, 381 (7th Cir.1985), cert. denied, 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 979 (1986), and that this was sufficient to render the service area agreement immune as state action regardless of whether the state actively supervised the contract or its effects. Fuchs, 672 F.Supp. at 1114. Defendants argue that the district court correctly held that active supervision was not necessary, but add that in any event the challenged service area agreement was actively supervised by the state. Plaintiffs contend that the court erred in not applying the active supervision test to defendants, and that there is no meaningful active supervision because RECC's rates (as opposed to the service area agreement itself) are completely unsupervised. Applying what we determine to be the appropriate test for state action immunity in this case, we affirm the district court's conclusion that defendants may not be held liable under the antitrust laws for entering into the service area agreement.
 
 II.
 
 7
 The state action immunity doctrine, first enunciated in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), holds that the Sherman Act does not prohibit official action by, or directed by, the state. Patrick v. Burget, --- U.S. ----, 108 S.Ct. 1658, 1662, 100 L.Ed.2d 83 (1988). The doctrine has undergone substantial development and refinement over the last 45 years. Nonetheless, courts have often strained to fit cases into the prescribed analytical mold for determining whether a party's action is entitled to immunity. The Court first fully set forth a structured, two-prong test for state action in California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). Simply stated, private actors may be held liable under the antitrust laws unless they are acting pursuant to a "clearly articulated and affirmatively expressed" state policy to displace competition, and that policy is subject to "active supervision" by the state itself. See 324 Liquor Corp. v. Duffy, 479 U.S. 335, 107 S.Ct. 720, 725, 93 L.Ed.2d 667 (1987). The Court has recently clarified that state and quasi-state actors are subject to less stringent requirements than purely private actors. Town of Hallie v. City of Eau Claire, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). In order to identify the proper state action test to be applied to each defendant, we turn for guidance to the reasons behind the state action immunity doctrine, for its rationale must determine its scope. See Hartigan v. Panhandle Eastern Pipeline Co., 852 F.2d 891, 894 (7th Cir.1988) (en banc ).
 
 A.
 
 8
 The Supreme Court has stressed that the rationale underlying the state action doctrine is the federalist interpretation that the antitrust laws do not apply to actions of the sovereign states themselves. See Lopatka, The State of "State Action" Antitrust Immunity: A Progress Report, 46 La.L.Rev. 941, 943 (1986). Because Congress never revealed an intent to make the states subject to antitrust limitations, the Court refused to infer this purpose.[10] Parker, 317 U.S. at 351, 63 S.Ct. at 313-14; Southern Motor Carriers Rate Conference, Inc. v. United States, 471 U.S. 48, 56 & n. 9, 105 S.Ct. 1721, 1724 & n. 9, 85 L.Ed.2d 36 (1985). In other words, the antitrust laws do not apply to actions of the state which restrain trade, and therefore do not preempt laws authorizing such state action.[11] Thus, state action immunity is not dependent on the wisdom or extent of state regulation, only on whether the state is actually acting to displace free competition. See P. Areeda and H. Hovenkamp, Antitrust Law (1987 Supp.) p 212.1f (hereinafter "Areeda and Hovenkamp"). A court's analysis under the doctrine therefore focuses on whether it may be sufficiently confident that the state, rather than a private party hiding behind a "gauzy cloak" of state involvement, Midcal, 445 U.S. at 105, 100 S.Ct. at 943, is the relevant actor.
 
 
 9
 When the state itself in one of its incarnations performs the challenged activity, it is ipso facto immune from the antitrust laws. Thus, the Supreme Court has held that a state supreme court making decisions on admitting persons to the state bar is immune without further inquiry. Hoover v. Ronwin, 466 U.S. 558, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984). A state's governor's acts are also presumably immune, see Lopatka, 46 La.L.Rev. at 1039-40, although the Court has yet to say so. Once it is determined that the action is taken by the state itself, whether or not pursuant to some clear state policy, courts need not engage in any further inquiry--they must dismiss the federal antitrust claim. See Areeda and Hovenkamp paragraphs 212.1c, 212.6.
 
 
 10
 Municipalities exist under the laws of a state, but are not sovereign in and of themselves. Hallie, 471 U.S. at 38, 105 S.Ct. at 1716. The Court has therefore held that to be immune from the antitrust laws[12] municipalities must be acting pursuant to a "clearly articulated and affirmatively expressed" state policy to displace competition. Midcal, 445 U.S. at 105, 100 S.Ct. at 943. The state policy need not compel the municipality to take the challenged action; it is enough that anticompetitive effects are reasonably foreseeable consequences of the state's grant of authority. Hallie, 471 U.S. at 42, 105 S.Ct. at 1718. Nothing more is required to ensure confidence that the acts of a municipality should be shielded as acts of the state, because a municipality lacks the attributes and incentives of private actors, and does not pose the danger of private price-fixing that the antitrust laws were intended to prevent.
 
 
 11
 State agencies, although not tantamount to the state itself, are instrumentalities of the state which are necessary to implement state policies. The Supreme Court has declined to hold whether agencies must be actively supervised by the state, although it has noted that such a requirement is unlikely. Id. at 46 n. 10, 105 S.Ct. at 1720 n. 10. Perhaps because it is "not easy to imagine just how a state in practice would go about supervising its agencies," Lopatka, 46 La.L.Rev. at 1040-41, lower courts have held that such agencies are beyond the reach of federal antitrust restrictions as long as their anti-competitive activities were reasonably foreseeable. See Wicker v. Union County Hosp., 673 F.Supp. 177, 186 (N.D.Miss.1987) (hospital was government agency immune if acting pursuant to clearly articulated state policy); Humana of Illinois, Inc. v. Board of Trustees of Southern Illinois Univ., 1986-1 Trade Cas. (CCH) p 67,127 (C.D.Ill.1986) (state university was state agency requiring only clear articulation prong); Greensboro Lumber Co. v. Georgia Power Co., 643 F.Supp. 1345, 1383 (N.D.Ga.1986), aff'd on other grounds, 844 F.2d 1538 (11th Cir.1988) (electric authority composed of 46 Georgia municipalities and one county was state agency immune without regard to state supervision).
 
 
 12
 The state may, and often must, also turn to private actors to effect its policies. While the state itself is immune from any actions or agreements which would violate the antitrust laws, its purposes would be thwarted if the instrumentalities chosen to implement its policies could be held liable. Patrick, 108 S.Ct. at 1662.
 
 
 13
 If Parker immunity were limited to the actions of public officials ... a state would be unable to implement programs that restrain competition among private parties. A plaintiff could frustrate any such program merely by filing suit against the regulated private parties, rather than the state officials who implement the plan.
 
 
 14
 Southern Motor Carriers, 471 U.S. at 56-57, 105 S.Ct. at 1726-27. See also Cine 42nd Street Theater v. Nederlander Org., 609 F.Supp. 113, 119 (S.D.N.Y.1985), aff'd 790 F.2d 1032 (2d Cir.1986). The Supreme Court has therefore found that private parties may be immune, but only if they meet a more stringent two-part test. This test is designed to determine whether a private party is acting as an instrument of the state, or whether that individual or entity is hiding behind a "gauzy cloak" of state involvement to pursue anticompetitive private interests antithetical to the antitrust laws. Midcal, 445 U.S. at 106, 100 S.Ct. at 943-44. Not only must private parties show that the state clearly authorized their conduct, but also that the state actively supervised the allegedly anticompetitive policy. Without such supervision, the Supreme Court has determined, courts cannot be confident that private parties are carrying out the avowed policy of the state rather than abusing the state grant of authority to pursue their own ends. The active supervision requirement "serves essentially an evidentiary function." Town of Hallie v. City of Eau Claire, 471 U.S. 34, 46, 105 S.Ct. 1713, 1720, 85 L.Ed.2d 24 (1985). It provides a "realistic assurance that a private party's anticompetitive conduct promotes state policy." Patrick, 108 S.Ct. at 1663. Cf. Lopatka, 46 La.L.Rev. at 1002-03 (arguing that there is no strong justification for an active supervision requirement); Jorde, Antitrust and the New State Action Doctrine: A Return to Deferential Economic Federation, 75 Calif.L.Rev. 227, 249-50 (1987) (arguing that an active supervision requirement promotes the federalist value of citizen participation in government).
 
 
 15
 In the present case, the district court held that under the rationale for state action immunity clarified in Hallie, defendants were shielded from liability without regard to active supervision by the state. In Town of Hallie, four unincorporated townships sued the adjacent city of Eau Claire for acquiring a monopoly over sewage treatment services and for tying such services to sewage collection and transportation. The Court found that a Wisconsin statute authorizing a city to "fix the limits" of its public services in unincorporated areas and providing that "the municipal utility shall have no obligation to serve beyond the area so delineated" constituted a clearly articulated state policy to displace competition. The Court then considered whether active supervision was needed to render the conduct immune as state action. The Court reasoned that the supervision requirement served the evidentiary function "of ensuring that the actor is engaging in the challenged conduct pursuant to state policy." Id. 471 U.S. at 46, 105 S.Ct. at 1720. Because private parties engaging in anticompetitive activity are likely to be acting in their own interest, the Court imposed the supervision requirement "to ensure that the state action doctrine will shelter only the particular anticompetitive acts of private parties that, in the judgment of the state, actually further state regulatory policies." Patrick, 108 S.Ct. at 1663. In other words, it "is intended to control the potential for abuse created by authorizing private persons to make anticompetitive decisions and to insure that those decisions are consistent with the ... state policy at stake." Gold Cross Ambulance and Transfer v. City of Kansas City, 705 F.2d 1005, 1014 (8th Cir.1983), cert. denied, 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985). The Hallie Court held that there was "little or no danger" that a city such as Eau Claire was "involved in a private price-fixing arrangement." Hallie, 471 U.S. at 47, 105 S.Ct. at 1720 (emphasis in original). Eau Claire was therefore immune from antitrust attack despite the lack of state supervision over the city's sewage services.
 
 B.
 
 16
 There is no question that RECC and CIPS entered into, and the ICC approved, the service area agreement pursuant to "a clearly articulated and affirmatively expressed policy to displace competition." As the district court stated, one could hardly envision a statutory scheme that evinces a clearer, more affirmative intent. Fuchs, 672 F.Supp. at 1113. The problem in this case is to determine whether, or to what extent, the defendants are subject to both the clear articulation and active supervision prongs of the state action immunity test.
 
 
 17
 In antitrust cases, courts have often found it difficult to determine whether actors should be treated as public agencies or private entities. The dividing line is neither sharply drawn nor easily perceived. See Kennedy, The Stages of Decline of the Public/Private Distinction, 130 U.Pa.L.Rev. 1349 (1982). In Interface Group, Inc. v. Massachusetts Port Authority, 816 F.2d 9 (1st Cir.1987), a charter airline operator charged the port authority with unreasonable exclusive dealing because it allowed only certain ground services companies to operate out of the terminal that the charter's airplanes were required to use. The court held Massport immune under the state action doctrine because it was authorized by the legislature to set policies on who would use or service which terminal, irrespective of whether the port authority's actions pursuant to the policy were supervised by the state. "Even if Massport is not the state itself, it at least is equivalent to a municipality. The Supreme Judicial Court [of Massachusetts] has explicitly recognized that Massport resembles a municipal corporation and that Massport 'is in no sense a private or business corporation.' " Id. at 13 (citation omitted). The court noted that Massport possessed attributes of a governmental entity, including "the power of eminent domain, rulemaking authority, bonding authority, and tax exempt status." Id.
 
 
 18
 Similarly, in Ambulance Serv. of Reno, Inc. v. Nevada Ambulance Serv., 819 F.2d 910 (9th Cir.1987), a private ambulance services corporation sued defendant REMSA (a charitable Nevada corporation formed at the direction of the county board of health) and the county board for granting REMSA an exclusive franchise of emergency medical services. The Ninth Circuit found that the Nevada legislature expressly authorized the granting of an exclusive franchise to REMSA. In ruling that active supervision by the state was not a necessary precondition to state action immunity, the court wrote that REMSA could not be neatly characterized as either a private entity or the mere instrument of the board of health. "REMSA is not a private non-governmental entity that can be expected to pursue its own economic interests to the prejudice of the public ... [but] it is neither a city, a county, nor the ... Board of Health. Its interests are not precisely the same as theirs. REMSA falls somewhere between...." Id. at 913. The court concluded that REMSA was "much closer" to the municipality in Hallie than the private actors in 324 Liquor. See also Commuter Transp. Sys., Inc. v. Hillsborough County Aviation Auth., 801 F.2d 1286, 1290 (11th Cir.1986) (county aviation authority "analogous to a municipality" and therefore immune from antitrust attack, without regard to active supervision requirement, where legislature authorized the granting of an exclusive limousine operator's license to and from airport).
 
 
 19
 We therefore focus on defendants' attributes to determine whether they are the state, a state agency, or an "arm of the state" which may be presumed to act in the public interest, see Hallie, 471 U.S. at 45, 105 S.Ct. at 1719-20, or whether, like private parties, they might seek to further their own interests at the expense of state goals. Defendant Bushnell is being sued in her official capacity as Chairman of the ICC, an Illinois state agency, PUA Sec. 2-101 et seq., which approved the service area agreement pursuant to a clear state policy. ESA Sec. 406. She is therefore immune from liability as a state actor.
 
 
 20
 Defendant RECC does not fit easily into any clear category on the continuum from private to public. See Areeda and Hovenkamp, p 212.6 (noting "pervasive vexatiousness of this question"). It is neither a state agency, a municipality, nor a purely private actor. Plaintiffs charge RECC with horizontal market allocation and monopolization, and contend that there can be no adequate supervision of the market division "policy" without price supervision focusing on RECC's rates. We recognize that a pointed re-examination of market conditions is necessary to constitute active supervision of private parties. We hold that RECC should not, however, be subject to such a stringent standard.
 
 
 21
 The district court found RECC analogous to a municipality and therefore held that active supervision was not required under Hallie. We agree with the district court that RECC cannot be characterized as a purely private actor. Unlike private actors who seek to further their own interests and will exploit market factors to reap the highest possible profits, rural electric cooperatives are in some sense "instrumentalities of the United States." Alabama Power Co. v. Alabama Elec. Coop., Inc., 394 F.2d 672, 677 (5th Cir.), cert. denied, 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968). See Affiliated Capital Corp. v. City of Houston, 735 F.2d 1555, 1571-72 (5th Cir.1984) (Higginbotham, J., concurring specially), cert. denied, 473 U.S. 1053, 106 S.Ct. 788, 88 L.Ed.2d 766 (1986). RECC is a not-for-profit corporation which charges no more than necessary to cover the cost of electricity from WIPCO plus debt service and expenses. Fuchs, 672 F.Supp. at 1114. Its by-laws dictate that all excess amounts must be refunded to member/owner/customers. Id. RECC's only purpose is to provide power to its members as cheaply as possible consistent with the requirements of its REA financing. Moreover, if it pursues its own "interests" (whatever these might be) to the detriment of its owners, antitrust law seems an odd vehicle for relief. All of the shareholders of a corporation do not typically come together to sue their corporation for harm it does to them; rather than sue themselves, they act together to form new management and set new policies. As the district court noted, grievances of this type are best resolved in the board room or "through the legislature, not in litigation." Fuchs, 672 F.Supp. at 1116.
 
 
 22
 We do not believe, in light of RECC's non-private attributes, that it should be subject to the same state action analysis applicable to a purely private party. However, it is neither a municipality nor a state agency. Although RECC has the power of eminent domain (ESA Sec. 413), it is not a body politic like a municipal corporation and is not subject to public scrutiny through sunshine laws or the political process. See Hallie, 471 U.S. at 45 n. 9, 105 S.Ct. at 1719 n. 9. It is a hybrid entity with sufficient non-private attributes that its activities require some lower level of supervision to ensure that it is acting pursuant to state policy. See Areeda and Hovenkamp p 212.9f.
 
 
 23
 We hold that when an entity charged with an antitrust violation is neither a municipality nor a state agency but does not have the attributes of a purely private actor, it may be held immune as a state actor without the active scrutiny of market conditions which is a necessary prerequisite for holding a private entity immune. Under the ESA, the ICC approves the agreement, resolves all disputes under it, and has the power to enforce compliance with its rulings. ESA Secs. 407-416. In light of RECC's attributes, the scheme providing ICC supervision of the service area agreement constitutes adequate assurance that RECC is acting to implement state policy. RECC is therefore immune from antitrust liability as a state actor.
 
 
 24
 Defendant CIPS is a private entity charged, like RECC, with entering into an agreement to divide markets and a "refusal to deal" on the basis of that agreement. There is no allegation that CIPS' rates are unsupervised or excessive (indeed they are claimed to be preferable to RECC's rates). CIPS is a public utility subject to the full panoply of ICC regulation. It acted pursuant to clear state policy, and its alleged anticompetitive conduct--the agreement--is actively supervised by the ICC. To the extent that the inquiry into CIPS' immunity must focus on the prices charged by RECC, we have already held that RECC is not involved in the kind of private price fixing forbidden by the antitrust laws. Therefore, CIPS may not be held liable for such price fixing. Further, it would be anomalous to hold CIPS alone liable for rates charged by an unregulated electric supplier on the basis of an agreement largely mandated by and supervised by the state. As to CIPS, therefore, the challenged restraint is clearly articulated and the "policy" actively supervised within the meaning of Midcal.
 
 
 25
 The decision of the district court is AFFIRMED.
 
 
 
 [1]
 Although state action is not truly an "exemption" or an "immunity" from the federal antitrust laws, but rather is conduct not subject to those laws, for convenience we use these terms to describe the defendants' status in this case
 
 
 [2]
 WIPCO's "sole function is to supply electricity to its member cooperative systems at wholesale.... It is owned by seven electric distribution cooperatives, and its board of directors is comprised of representatives of these corporations." Western Illinois Power Coop., Inc. v. Property Tax Appeal Board, 29 Ill.App.3d 16, 331 N.E.2d 286, 288 (1975). Apparently, in the late 1970's, WIPCO and another cooperative negotiated with the Illinois Power Company to acquire an ownership interest in the new Clinton Nuclear Power Plant. "[T]he REA has urged participation by federated cooperatives [such as WIPCO] in agreements involving the joint ownership and operation of large-scale generation facilities," especially nuclear power plants. Greensboro Lumber Co. v. Georgia Power Co., 643 F.Supp. 1345, 1360-61 (N.D.Ga.1986), aff'd, 844 F.2d 1538 (11th Cir.1988). As a part owner of Clinton, WIPCO was responsible for part of the financing of the plant, which experienced substantial cost overruns during construction. Although the record on appeal contains no information about WIPCO's costs and their effect on RECC's rates, the rates WIPCO charges RECC and its other member cooperatives may have risen commensurately with its increased financial obligation to the Clinton project. See Fuchs, 672 F.Supp. at 1112 n. 2. This may be the root cause of plaintiffs' complaints about their rates. See infra note 8
 
 
 [3]
 7 U.S.C. Sec. 904
 
 
 [4]
 The plaintiffs also brought suit against Mary Bushnell, Chairman of the Illinois Commerce Commission, presumably under the theory that the Commission should not have approved the service area agreement or should have regulated the prices charged by RECC
 
 
 [5]
 "An industry or activity is said to be a natural monopoly if production is most efficiently done by a single firm or entity." R. Schmalensee, The Control of Natural Monopolies 3 (1979). See, id. at 3-7, 89-99. High fixed costs and economies of scale prevent the survival of competition in the marketplace. See Affiliated Capital Corp. v. City of Houston, 735 F.2d 1555, 1563 (5th Cir.1984), cert. denied, 474 U.S. 1053, 106 S.Ct. 788, 88 L.Ed.2d 766 (1986)
 
 
 [6]
 Defendants do not concede a per se violation, contending that the contract must be evaluated under the rule of reason. Because we find that defendants' challenged action was state action not subject to the federal antitrust laws, we do not address the issue of whether the service area agreement on its face violated the antitrust laws. The challenged restraint must be considered an act of the state pursuant to state law, and the ESA is therefore not preempted by the federal antitrust laws. See 324 Liquor Corp. v. Duffy, 479 U.S. 335, 107 S.Ct. 720, 726 n. 8, 93 L.Ed.2d 667 (1987); Rice v. Norman Williams Co., 458 U.S. 654, 102 S.Ct. 3294, 73 L.Ed.2d1042 (1982); P. Areeda and H. Hovenkamp Antitrust Law (1987 Supp.) p 209.2 (Parker and Rice mandate essentially the same preemption inquiry)
 
 
 [7]
 Commissioner Bushnell points out in her brief that even in the absence of the agreement, the ESA freezes service areas. CIPS would need a certificate of public convenience and necessity under PUA Sec. 8-406 in order to extend service to RECC's current customers. Although the primary factor in the issuance of such a certificate is cost savings to customers, PUA Sec. 8-406(d), the existence of a similar service (RECC) in the area might preclude issuance of the certificate
 
 
 [8]
 This dispute is apparently but one variation of the periodic conflicts occurring between co-op customers and their electricity suppliers. When Congress enacted the REA in 1936, ninety percent of rural residents were without electric power. The REA (along with the National Rural Utilities Cooperative Finance Corporation, which provides additional financing to supplement the REA's loan and loan guarantee program) provided the loan capital for the construction of facilities, the extension of lines, and the generation and transmission of power in sparsely populated areas "which the investor-owned utilities had not found it profitable to service." Salt River, 391 F.2d at 473. Total cumulative government financing of rural electrification approaches $50 billion. The co-ops pay for these loans through their member/consumers' electric rates. Now that the rural electric systems are almost universally in place, but not paid for, some co-op customers are disgruntled with their rates, which necessarily reflect the amortization cost of the system
 Consequently, distribution co-ops have tried to sell their assets to neighboring investor-owned utilities, Tri-State Generation and Transmission Assoc., Inc. v. Shoshone River Power, Inc., 805 F.2d 351 (10th Cir.1986), or to void their long-term contracts with co-op suppliers whose rates are higher than neighboring utilities. United States v. Southwestern Electric Coop., 663 F.Supp. 538 (S.D.Ill.1987). The withdrawal of any distribution co-op from the system necessarily shifts the fixed costs of the electricity (represented by the debt service) to the other members of its generation and transmission cooperative and raises the possibility of default, with potentially disastrous results for the system. See Tri-State, 805 F.2d at 357. It is clear that somebody will have to retire the debt of the rural electrification system; if co-op customers like plaintiffs succeed in removing themselves from the REA structure in large enough numbers to precipitate default, the costs may eventually be shifted to federal taxpayers.
 
 
 [9]
 By "antitrust laws" we mean the federal antitrust laws referred to in Sec. 1 of the Clayton Act, 15 U.S.C. Sec. 12
 
 
 [10]
 Plaintiffs argue that Congress would have explicitly excluded electric cooperatives from the antitrust laws, as it did agricultural (15 U.S.C. Sec. 17; 7 U.S.C. Secs. 291-92) and fishery (15 U.S.C. Secs. 521-22) cooperatives, had it intended them to be exempt. The crucial question for state action analysis, however, is whether the state intends to and does act in its sovereign capacity. The Supreme Court has held that Congress did not attempt to intrude on state regulatory behavior
 
 
 [11]
 See supra note 6
 
 
 [12]
 The Local Government Antitrust Act of 1984, 15 U.S.C. Secs. 34-36, immunized municipalities from antitrust damages liability